No. 10,479.

EDWARDS v. THE PEOPLE.

Decided May 7, 1923.  Rehearing denied June 4, 1923.

Plaintiff in error was found guilty of voluntary manslaughter.

*Affirmed.*

1.  CRIMINAL LAW—*New Trial—Surprise—Insane Witness.* Generally speaking, the fact that a party is surprised at the testimony of his own witness, is not ground for granting him a new trial.

    Neither is insanity of a witness ground for a new trial, unless it clearly appears to the court, among other things, that the witness was actually insane at the time the surprising evidence was given.

2.  *New Trial—Surprise.* A party cannot avail himself of the plea of surprise, unless he calls the attention of the court to the matter at the time when it occurs, and asks for proper relief.

3.  *New Trial—Surprise—Discretion.* Evidence reviewed, and held that the showing of surprise at the testimony of a witness, was entirely insufficient to justify the granting of a new trial.

    The granting of a new trial on the ground of surprise is within the discretion of the court, and its exercise, if not abused, will not be interfered with on review.

4.　*New Trial—Newly Discovered Evidence—Diligence.* Newly discovered evidence is not a sufficient ground for the granting of a motion for a new trial, where it appears that there would probably be no change in the result if a new trial were granted.

　　Neither will a new trial be granted on such ground, where it appears that defendant was not diligent in discovering the evidence before the trial.

5.　*New Trial—Newly Discovered Evidence.* Courts look with disfavor upon applications for a new trial on the ground of newly discovered evidence.

6.　*Homicide—Instructions.* The contention in a homicide case, that the court erred in submitting the question of voluntary manslaughter to the jury, overruled.

7.　*Instructions—Requests.* Error cannot be predicated on the failure of the court to give instructions for which there is no request.

8.　*Instructions—Involuntary Manslaughter.* Under the evidence, it is held in the case under consideration, that there is no element of involuntary manslaughter involved, and no error in the failure of the court to submit that question to the jury.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Butler, Judge.*

Messrs. Irwin & Friend, for plaintiff in error.

Mr. Victor E. Keyes, Attorney General, Mr. Charles R. Conlee, Assistant, Mr. Russell W. Fleming, Attorney General, Mr. R. R. Cloud, Assistant, for the people.

*En banc.*

Mr. Justice Campbell delivered the opinion of the court.

The defendant, Leo Harvey Edwards, shot and killed Floyd Barnetson. The information charged murder in the first degree. The jury found defendant guilty of voluntary manslaughter. He was sentenced to the state penitiary for a term of not less than five, nor more than eight, years. It is the object of this writ of error to set aside that judgment.

The homicide occurred April 23, 1922, at or near the residence of the defendant's parents, with whom he was then living, in block 5, town of Berkeley, City and ·County of Denver. The Edwards family resided in the upper story of a one and one-half story brick garage which was built upon lots fronting west on 38th street, thence extending east to about the center of the block. The Barnetson family lived upon premises in the same block, fronting west on Wolff street and extending south to the center of the block, the rear end of these lots adjoining the rear end of the Edwards premises. For about one year preceding the homicide various disputes and controversies were waged between these two families and different members thereof. It is sufficient for our present purpose to say that the disputes arose out of, and were founded on, the different views which the families entertained and asserted as to whether or not two certain strips of ground, one immediately to the south, and the other to the east, of the Edwards premises, were public or private alleys. As is not infrequent in such neighborhood quarrels, the controversies developed into what counsel call "an inter-family feud." There were a series of law suits between the parties, one of which reached this court. The Barnetson family removed a fence and tore down a chicken shed which the Edwards family had built on the rear of their lots, claiming that such erections encroached upon the Barnetson premises. Violent quarrels and personal encounters, more or less serious, took place. Threats are said to have been made by the deceased against all the members of the Edwards family, and assaults of different kinds, back and forth, had been committed. Of these controversies the defendant was aware, and, although he was not directly involved in any overt act, he was, to some extent, a participant therein, or, at least, sympathized with his own family. On the Sunday morning of the homicide, about 9 o'clock, while defendant was asleep in the second story of the Edwards home, having been out late the night before, Floyd Barnetson appeared upon or

near the alleyway running east and west along the south side of the Edwards premises, for what reason it is not clear, and, at once, or soon thereafter, he and Guy Edwards, the father of the defendant Leo, began fighting. The fight continued for some time and was re-opened once or twice, the result of which was that Barnetson was worsted. For some reason which the defendant is unable to explain, he was awakened. He got out of his bed, walked to a window in the south of his bedroom, and, as he looked out, saw his father in the act of rising from the ground, while Barnetson was lying across the drive, or alleyway, west of an ashpit, which was about 20 feet east of, and in a direct line with the window. Defendant remained there a few seconds, and left the window—when he saw his father on his feet and the deceased starting to get up—to get his underwear, and returned again to the window and saw that his father and Barnetson had renewed the fight. Finally they separated, Barnetson going in a northeasterly direction and his father returning into his garage in the first story immediately below the window. The defendant then left the window again to get his trousers and before he had put them on, saw Barnetson returning to the scene of conflict, whereupon the defendant again went back to the window, picking up a revolver which was lying on the dresser in the room, opened the window screen with his left hand and called to Barnetson, who he says held in one of his hands a baseball club or bat, not to hit anyone with it. At the same time he noticed his mother standing near the corner of the chicken yard, which projected from the Edwards' main building, and that the deceased was walking across the alleyway towards her, and his mother dropped the garden hose, which she had been holding in her hand, which fell near the corner post of the pen, and Barnetson picked it up, shoved it through the east side of the chicken pen, and, when the mother reached down to take hold of it, the deceased pulled it out of the chicken pen and turned the hose on his mother. The mother then stooped over and

picked up a board which she held over her shoulder, whether to protect herself or to keep Barnetson from striking her, is in dispute. However that may be, Barnetson dropped the hose and defendant again called to him not to hit his mother. Barnetson then pushed his arm towards defendant's mother and struck her on the head with the baseball bat, and as she fell back defendant fired three shots from the revolver at Barnetson, from the result of one of which shots he afterwards died. After he was shot, Barnetson turned and again struck his mother, and defendant then left the window. Defendant testified that he did not shoot to kill Barnetson, but shot at his legs to disable him and prevent him from hitting his mother again; was not angry at the time, and there was no other purpose in shooting, except to prevent his mother from receiving blows at the hands of the deceased.

The theory of the prosecution was that, not only did Barnetson not strike the defendant's mother, but when the shots were fired, he was not on the Edwards property, but to the east of the disputed alleyway and south of the chicken yard. The defense was that the homicide was justified in necessary defense of the defendant's mother, and that the deceased was not on the disputed alleyway, or to the east of it, but was on the Edwards property and actually in the act of striking Mrs. Edwards with a baseball bat when the defendant fired the shots.

There were a number of witnesses for the prosecution and for the defense. There was no dispute as to the identity of the defendant as the one who fired the shot. He admitted it. Much of the testimony is conflicting as to the exact position in which Mrs. Edwards and Barnetson were, relative to each other, when the shots were fired, and the defendant says that the conflict was as sharp and irreconcilable between the People's witnesses themselves as it was between their witnesses and the witnesses of the defendant.

There are four principal grounds relied upon for reversal: 1. Surprise occurring at the trial which could

not have been guarded against; 2. Newly discovered evidence; 3. Error in instructions given to the jury; 4. Error in refusing instructions asked by the defendant.

1. The defendant's father was one of the defendant's witnesses. Just before, and at the time of the shooting, this witness says he was in his garage after Barnetson had, as he supposed, left the premises, did not know that Barnetson had returned until he heard his son's voice from the bedroom window commanding Barnetson not to hit anyone with a club, and he then at once stepped to the door of the garage and saw what the defendant in his testimony, hereinabove summarized, described as taking place between Barnetson and Mrs. Edwards. Upon cross-examination by the district attorney, Guy Edwards testified that he saw Barnetson with the club in his hand before he struck his wife with it, and afterwards when he was in the act of repeating the blow, and had ample time to protect his wife and go to her rescue, but did not do so. He was given an opportunity, both by the district attorney and the court after he admitted, as the result of repeated questions that he had ample time therefor, to explain why he did not go, but he did not explain. Upon re-examination, defendant's counsel, evidently perceiving that an unfavorable impression was, or would be, created in the minds of the jury by the failure of the husband to go to his wife's assistance, in the circumstances detailed, asked the witness to state his reason for not doing so. Counsel doubtless expected the witness to assign as the reason for such failure to do what any normal husband naturally would do, that he was engaged in looking in the garage for a gas pipe with which to repel Barnetson's assault on his wife, which he had before the trial given to counsel as an excuse for his unnatural conduct. Thereupon the following occurred: "Q. You said to Judge Sales that there was a reason why you did not go out the garage door when you saw Barnetson coming back, will you state what your reason was? A. I knew the position that Leo must be in, and was afraid that a man running under a gun, he

would be more apt to get shot than if he would have been coming from the other way; I would have been there—don't worry—I didn't dare run under it for I knew that Leo might accidently shoot one of us in the struggle."

Upon recross-examination by the district attorney, the father said that he had no understanding with Leo that when Barnetson came around there that he, Leo, was going to shoot with a gun, and then the following occurred: "Q. How did you know he, (Leo), was going to shoot? A. Well, I knew where he was at, and he told me and I knew that boy would protect his mother through fire. Q. You knew he was going to shoot, did you? A. Yes, sir. Q. And you did not want to run under the gun? A. I did not dare."

There could scarcely be a more injurious bit of testimony against the defendant than this explanation of his father. Defendant says it was commented on with telling effect by the district attorney as showing a preconcerted plan of the Edwards family to entrap and kill Barnetson. It may be that it tended to show that the father felt sure that his assistance was not necessary because Leo would be, and was, in a position effectively to repel the assault, without the necessity of the father exposing himself to possible danger. Other interpretations might be put upon it. However this may be, it was testimony harmful to defendant. Counsel for defense say that it came as a complete surprise to them for the reason indicated. They did not, at the time, or during the further progress of the case which continued for a day or more thereafter, endeavor, so far as the record shows, to call the attention of the witness to his previous inconsistent statement, or, rather to his failure to make known to the defendant or to his counsel, that his reason for not going to the rescue was his fear of being shot. Counsel did not ask for a continuance or postponement of the trial for further investigation, or express to the court, or to the prosecution, their surprise at the explanation given. After the jury had returned its verdict, which was on the 10th

day of June, this testimony being given on the 8th day
of June, the defendant's mother's affidavit states that,
after her husband had given this testimony, she noticed
that he talked wildly and imagined that he was being pur-
sued by some enemy, talked incoherently, and had nothing
to say about the case on trial.  Probably as the result of
the wife's suspicion that her husband was mentally un-
balanced, an examination by three physicians was made
as to his mental state, on the 12th of June, and one of
the physicains, who had made a special study of mental
diseases and the different forms of insanity for many
years, made an affidavit which was filed in support of the
motion for new trial, in which he says that on the day of
the examination Guy Edwards was insane and in a con-
dition of mania which he believed undoubtedly existed
for a number of days prior thereto; that Edwards talked
a good deal and was incapable of giving a coherent ac-
count of anything, and the opinion of the expert was that
any testimony that Edwards might have given within a
few days prior to June 12th would be unreliable; that
any account that the witness might have given of the
shooting would likely be distorted and not based upon fact,
and that Edwards' condition of mania ordinarily does not
come on suddenly but is a result of conditions sometimes
existing for a week, but most usually for a period of
months and years.  There is no affidavit by either of the
other two physicians and we are not advised who they
were or what their opinion was.  It was largely, if not
exclusively, upon the affidavit of the expert, and the affi-
davit of Edwards' wife, taken in connection with the state-
ments which Edwards had frequently made to various
other persons before the trial, that the defendant now re-
lies in support of his contention that surprise, which could
not have been guarded against, and newly discovered evi-
dence furnished by the affidavit of the expert, are a suffi-
cient reason for the granting of his motion for a new trial,
which the trial court refused.

Generally speaking, the fact that a party is surprised

at the testimony of his own witness, is not ·a ground for granting him a new trial. Neither is insanity of a witness ground for a new trial, unless it clearly appears to the trial court, among other things, that the witness was actually insane at the time the surprising evidence was given. *Commonwealth v. Borasky,* 214 Mass. 313, 101 N. E. 377, cited by defendant, was a case where the defendant's motion for new trial was based upon newly discovered evidence, the substance of the ground being that the witness giving it had died since the trial, upon whose body an autopsy was performed which showed such a diseased condition of his brain that his testimony given at the trial was unworthy of belief, and that the evidence of other witnesses was not sufficient to warrant the verdict. Four physicians signed an affidavit to the effect that they had taken part in the autopsy and that the witness' brain was diseased, and had been for many years, and concluded in these words: "Evidence of the final organic process which terminated life made itself clearly manifest on the day that the jury returned its verdict. Whether the process developed acutely or had been coming on for some time we are unable to say. Such a brain disease means a modified mentality. Statements made by the witness at any time might be reliable or unreliable." The affidavit in the Massachusetts case presented as strong a case of insanity as does the testimony of the expert here as to the sanity of Edwards. The expert here does not pretend to say that Edwards was insane when he gave the testimony, but that in his opinion his testimony would likely be distorted and unreliable; and, while he says that ordinarily Edwards' condition of mania is of long duration, he does not say that it does not at times come suddenly. The Massachusetts Supreme Court gave an answer which we adopt here as conclusive against the defendant.

"The affidavit of the physicians went no further than to show that facts revealed by the post mortem examination * * * might or might not have affected his testimony. There is nothing in the record to indicate the ex-

perience of the affiants in that branch of medicine, nor how far they were capable of determining the mental condition of the deceased at the time he gave his testimony. Attaching full weight to the supporting affidavit, it cannot be said to throw greater probability on one side than on the other. The judge who passed upon the motion saw the witness upon the stand, and had full opportunity to observe whether he showed any symptoms of unreliability in giving his testimony. His manner and appearance together with what he said and all the other circumstances were for the consideration of the judge in reaching a conclusion."

While the expert here did have experience in mental diseases, he did not state he was capable of determining Edwards' mental condition at the time he gave his testimony. We have resorted to the transcript and read the entire testimony of Guy Edwards which consists of many folios. The witness testified to many things about the family feud, and went into great detail as to many of them. There is not the slightest incoherency in his testimony, and, while his grammar is not always of the best, his answers indicate intelligence and a full realization of what was asked and what he testified to. There was no indication of being entrapped, nor was there any indication of mental weakness. The conduct of defendant's counsel at the time, by failing to refresh the memory of the witness, and in not asking for a continuance to investigate, demonstrates quite conclusively that they, at least, had not the slightest suspicion of the witness' insanity or of his weakened mental condition. The judge, whose rulings throughout the trial show a marked fairness to the defense in every respect, had a better opportunity than we have, to judge of the witness' mental condition at the time he gave his testimony, and he evidently believed that the witness was not then insane; otherwise, he might have granted the motion for a new trial, as the witness' testimony certainly was damaging and, perhaps, controlling, with the jury in its verdict.

Aside from the foregoing, defendant's failure at the time this evidence was given, to avail himself of the usual means to escape its consequences, disentitles him to the relief asked. In *Outcalt v. Johnson,* 9 Colo. App. 519, 525, 49 Pac. 1058, 1060, it is said: "It is well settled that a party cannot avail himself of this plea (of surprise) unless he calls the attention of the court to the matter at the time when it occurs and asks for proper relief. It is too late for him to manifest his surprise for the first time after the cause has been submitted to the jury and a verdict rendered against him."

In *Lee-Clark-Andreesen H. Co. v. Yankee,* 9 Colo. App. 443 (48 Pac. 1050), at page 448, it is said: "If surprised, and the evidence were deemed material, the court might, upon application by plaintiff, have granted a temporary postponement of further proceedings until the plaintiff could prepare to properly meet this unexpected testimony, or it might have allowed a continuance, * * *. Plaintiff allowed the trial to proceed, however, without seeking any relief from its alleged embarrassment, and did not make its surprise known to the court until after it had taken the chance of a verdict in its favor and failed."

In *Sanders v. State,* 7 Ga. App. 603, 67 S. E. 696, the court, in substance, says that a party cannot take chances of a verdict and then claim a new trial on the ground of surprise.

In 16 C. J. section 2626, p. 1127, the author says: "But notwithstanding the disposition of the courts to see to it that a miscarriage of justice shall not occur through surprise or mistake, the granting of a new trial on such grounds is wholly within the discretion of the court, in the exercise of which relief will not be granted unless it appears that the surprise or mistake was in no way attributable to defendant's negligence."

And on page 1128 the author says: "As in other cases where a new trial is sought, a party will not be permitted to sit mute, claim no surprise in the trial, speculate on the verdict, and, when it is found against him, claim the right

to the new trial on the ground of surprise, the usual rule being that in order to save the point he must ask for a continuance or postponement."

See also *Rice v. People,* 40 Colo. 377, 90 Pac. 1031. Of course, the discretion is a legal discretion, and its exercise, if not manifestly abused, will not be interfered with by a reviewing court.

There is no claim here that in the event of a new trial, the defendant will be able to produce evidence that the explanation Guy Edwards gave for not coming to the rescue of his wife, was not true. In other words, defendant would not be able to overcome this incriminating testimony. Evidently the object is to get a new trial and, by not calling Guy Edwards as a witness, thereby escape the unfavorable result which this testimony, if repeated, would have with the jury. We are not cited to any case or principle of law that justifies the court in granting a new trial in such circumstances and for such purpose.

The affidavit of the expert might be classed as newly discovered evidence of a fact which was not available at the trial, since the discovery of insanity was made after the trial ended. Without entering upon a discussion of that feature of the case, it is sufficient merely to say that the newly discovered evidence goes only to the ability of the witness to give trustworthy testimony. It does not tend to disprove the explanation, or negative the reason given by the witness for not going to his wife's rescue.

Defendant has cited *Helwig v. Second Avenue R. Co.,* 29 N. Y. Supp. 9, to the point that, in the determination of a motion to set aside a verdict on the ground of surprise and newly discovered evidence, the interest of justice is the paramount consideration, and will prevail over the technical rules of practice. The facts of that case are, as the court in its opinion states, most remarkable. The opinion states that the specific surprise and newly discovered evidence relied upon are not such as had ever engaged the attention of courts, and been adjudged grounds for vacating a verdict. The trial court, however, found, and

the reviewing court approved the finding, that the plaintiff, who had secured a large verdict against the street railway company, had been guilty of subornation of perjury and the suborned witness gave testimony which determined the verdict for the plaintiff. Because of this infamous perversion of justice, and because both tribunals also were satisfied that the witness whose testimony occasioned surprise was actually insane at the time he delivered his testimony, the verdict was set aside and a new trial granted. No such state of facts exists in the instant case.

2. It is also urged in argument that the defendant was surprised at the testimony of George Probert, one of the witnesses for the prosecution. The ground for this surprise is said to be that Probert testified that he was at his breakfast table in the second story of his house, in the same block, and to the southeast of the Edwards home, when he heard the disturbance between Edwards, the father, and Barnetson, and when the shooting took place, and that as he looked out of the double window on the west side of his house, he saw the position of Mrs. Edwards near the corner of the Edwards garage with reference to that of the deceased. Defendant says if a new trial is had that he will be able to show, as stated, in affidavits of W. H. Dempster and others, that this testimony of Probert is not true, and that it was impossible for Probert, standing as he says he was at the upstairs window of his home, to see Mrs. Edwards at a point where in his testimony he placed her.

Unquestionably the testimony was on a material point. However, a large plat or map was introduced in evidence at the trial by the District Attorney, on a proper scale, which was said by the defendant's counsel to be correct. A large number of separate photographs of the situation of the different buildings in this block, and particularly of the Edwards garage and chicken yards, were also introduced. The alleged surprise should have been, and was, just as much of a surprise to the defendant at the time

Probert gave his testimony, as it was afterwards, and if the testimony was false or incorrect, the witnesses were available to disprove Probert's statements. Our ruling as to the surprise at Guy Edwards' testimony applies here. We have had the benefit of this map, which we are asked by defendant's counsel to consider in our examination of this case, and, in our judgment, the trial court was justified in holding the showing of surprise at Probert's testimony entirely insufficient. There was no surprise, in the legal sense, and the map itself refutes the affidavits.

3. The defendant says that since the trial he has discovered that four witnesses, whose affidavits are filed in support of his motion, were in the vicinity of the place of the homicide and saw the shooting and the position of the deceased, Mrs. Edwards, and the defendant at the time, and that they would, in event of a new trial, testify substantially in corroboration of the defendant, his father and mother as to their relative positions when defendant fired the shots. Counsel for defense say that the testimony at the trial, upon this material point, is contradictory, and that most of the witnesses for the prosecution, of whom there were twelve or more, sustain the testimony of the defendant and his theory as to the relative positions of the parties, and that only two or three witnesses for the prosecution locate these parties in places that correspond to the theory of the prosecution. If this testimony of the four newly discovered witnesses will be what the affidavits lead us to infer, it would be, in accordance with all definitions by the courts, merely cumulative and to the same point as much of the evidence produced at the trial. If we should agree in all respects with counsel for defendant in their statements of the applicable law, as to what the showing should be in support of a new trial on the ground of newly discovered evidence, which they say is succinctly stated by the author in 46 L. R. A. (N. S.), pages 903 to 920, particularly at page 904, we could not reach the conclusion that, if the evidence of these four witnesses had been given at the trial, the result would

have been different, or, that, if given in the event of a new trial, it would probably change the result.   Without entering into a discussion of what it is necessary to show to make newly discovered evidence a ground for a new trial, we refer to one of the leading cases in this Court which has been repeatedly cited with approval in our subsequent cases, *C. S. & I. Co. v. Fogelsong*, 42 Colo. 341, 94 Pac. 356. It may be true that, even though merely cumulative evidence, subsequently discovered, may warrant the granting of a motion for a new trial, if the court, upon a consideration of the entire record should be of the opinion that it is of such character as to render a different result probable on a re-trial of the case.   But, as we have said, in view of the fact that the jury, with a map or plat before it, which delineated the situation clearly and accurately, and, as the defendant himself claims, with the testimony of a number of the witnesses for the prosecution corroborating the defendant in his evidence as to the location of his mother and the deceased at the time of the homicide, we can not say that there is a probability that there would be a change in the result if a second trial is granted.

But a conclusive answer to this assignment is that the defendant was not diligent in discovering these witnesses before the trial.   One of his counsel makes an affidavit,— and he is supported by several affidavits of friends of the Edwards family, employers of defendant, who were intensely interested in the defendant's case,—that before the trial the defendant caused to be instituted a diligent inquiry and investigation of every person in the vicinity of the place of the homicide to ascertain who were present or who saw the shooting, but that as a result of this investigation, which was kept up for several weeks before the trial, they were unable to discover any persons who were present, except the witnesses which the defendant produced at the trial and the witnesses of the prosecution. Each of these newly discovered witnesses filed an affidavit as to what would be his testimony, which tends to sustain the theory of the defendant on the point in question.

Each of these witnesses lives in the immediate vicinity of the place of the homicide, neither of them more than two blocks distant. After the shooting took place three of the four say that they walked over to the Edwards residence and remained there until the ambulance came and removed Barnetson. There were a number of other persons there at the time and it is inconceivable that some one did not know, or might have known, of their presence. It is almost unbelievable, in view of the affidavits evidencing their belief in the innocence of the defendant, that these witnesses would suppress their knowledge of the facts which, if before a jury, would enable an innocent person to gain his freedom. Neither of them so stated in the affidavits, but one of the attorneys for the defendant, in his affidavit, says that he was told by these witnesses that they had not made known before the trial their knowledge of the transaction for the reason that they were afraid of court and court procedure, and were afraid of becoming involved in personal altercations with the witnesses for the People, and they thought defendant would be acquitted without their testimony. Possibly the trial court, in passing upon the showing, had, at least, a fleeting suspicion that the testimony of witnesses, who purposely withheld helpful testimony to an innocent person, would not be likely to have much influence with any jury. It is also probable that the court concluded that, if the same diligence had been exercised, and the same influence been brought to bear before the trial, that were in evidence after the unfavorable verdict these witnesses would have been on hand to give their testimony when the trial was called. Just how, or by whom, or by what efforts these four witnesses were discovered is not even suggested in the affidavits supporting the motion for a new trial. The lack of a showing in this respect is strange, if not significant. Had such information been given to the trial court, it would, at least, have been helpful in determining the diligence, or lack of it, which was employed before the trial in searching for them. How soon after the verdict,

which was returned on June 10th, they were found, is not made to appear. It must have been before June 16th, for on that day they made their affidavits. If they were discovered six days after the verdict, without a showing that any particular effort was made to find them, it is strange, indeed, that diligent search and investigation by "at least fifty persons", under the direction of defendant's counsel, before the trial, failed to discover them while they were living all of this time, in the immediate vicinity.

One of these witnesses, Lantzy, in his affidavit says that *on or about* June 10th he told W. H. Dempster, H. L. Dempster and R. E. Tipton, employers of defendant, (who had been diligent and active in assisting the defendant in his defense and searching for evidence before the trial), of the facts set forth in his affidavit, that these four witnesses saw the shooting. W. H. Dempster, who makes an affidavit in support of the motion for new trial, does not deny that he was so informed. Tipton says, in general terms, he did not know of the existence of these witnesses until long after the trial. He seems to think six days a long time. "On or about June 10th" is an elastic phrase. It may mean several days before, or several days after, the trial. If Lantzy really intended to give the impression that it was several days after the verdict that he imparted this information, the attorneys for the defendant who prepared the affidavit, probably would have been astute to express that meaning in unmistakable language. That it was not so expressed has a tendency to give the impression that Lantzy might have intended it to be understood that it was several days before the verdict of the jury that he disclosed to the defendant's employers that there were four witnesses to the shooting whose testimony would be favorable to the defendant, and that they, or some of them, would naturally at once communicate this fact to the defendant or his attorneys. Only the general statement of Tipton in his affidavit that he did not know of these witnesses until long after the trial, in the least degree tends to remove the unfavorable impression. Counsel for de-

fendant lay great stress upon the good character of these witnesses, which the District Attorney did not attempt to impeach, and to the evident spontaneity of their answers which were taken by the stenographer and incorporated in their affidavits. Doubtless it is true that the presumption of good character and honesty prevails until it is overcome, and we are not going outside of the record to impeach these witnesses. We are not impressed with the spontaneity of the language that appears in these affidavits. Doubtless their statements were taken down by a stenographer, as stated, but there is a remarkable sameness in some of the expressions which each of these four witnesses used. It is entirely proper, of course, for the affidavits to be prepared by counsel. One of these witnesses filed a later affidavit, at the request of the District Attorney, in which he says that where he is made to say in his first affidavit, prepared by the defense, that he could not say what took place between them, because Mrs. Edwards and Barnetson were so close together, and his own attention was attracted in another direction, is not true. He swears that he told defendant's counsel that he was in a position where he could see, and that he did not see Barnetson strike Mrs. Edwards with anything, but saw her strike him with a board. This latter affidavit was controverted by the affidavits of one of the attorneys, and by other persons, but we are not called upon to decide as to which of the conflicting affidavits is true, but suggest that it is unfortunate, at least, for them that, after defendant's counsel vouched for the integrity of these witnesses by filing their affidavits in support of a motion for a new trial, they should be called upon to file affidavits calling in question the integrity of one of them. The District Court passed upon the alleged conflict and we shall not interfere with its decision.

The general rule is that courts look with disfavor upon applications for a new trial upon the ground of newly discovered evidence. To look with favor upon them would bring about a looseness in practice, and encourage counsel

to neglect to gather all available evidence for a first trial, and speculate upon the verdict, and, if defeated, then to be diligent in securing other evidence to cure the defects or omissions in their showing at the first trial. Courts will see to it that there is not a miscarriage of justice, and are sometimes indulgent in their requirements as to a showing of newly discovered evidence, if they are impressed with the conviction that there has been a miscarriage of justice, even if the newly discovered evidence be incidentally impeaching in its nature and merely cumulative, when satisfied that there is probable cause that the result would be different as the result of such testimony. We do not believe there has been a miscarriage of justice in this case, and due diligence was not shown.

4. The court submitted the case upon three degrees of murder: Murder in the first degree; murder in the second degree, and voluntary manslaughter. The defendant says that no element of voluntary manslaughter is in the case; that the defendant was guilty of murder in the first degree, or he is not guilty. Defendant does say he was not angry at the time he fired the shots, and that his only purpose in shooting Barnetson was to protect his mother against a violent assault. Defendant's statement is not conclusive, but it is what the evidence, as a whole, shows which determines whether the court erred in submitting the case to the jury on voluntary manslaughter. We think the trial court was unquestionably right. Under our statute, "Manslaughter is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection." R. S. 1908, section 1625; C. L. 1921, section 6666.

The defendant was suddenly awakened from a sound sleep. In looking out of the window, according to his statement, he saw a man approaching his mother with a club,

who had previously made threats against the Edwards family, saw him inflict a blow upon her head, and in the act of repeating it. If such a situation was not calculated to, or did not, produce a sudden heat of passion, or if the shooting was not caused by a provocation apparently sufficient to make the passion irresistible, we are at a loss to conceive what would produce such effect in the mind of any sane or normal person. There is no merit in the objection.

5. The defendant also assigns as error the failure of the court to instruct on involuntary manslaughter. There are two answers to this objection. No request for such an instruction was requested by the defendant. Under the decisions of this Court an assignment, in such circumstances, has no merit. There is no element of involuntary manslaughter.

We have, as in all such cases, given this voluminous record attentive consideration. The trial court resolved every doubtful question in favor of the defendant, was diligent, even in the absence of a request by his counsel, to safeguard his interests and to check any tendency on the part of the prosecution, either to get before the jury improper evidence, or to suppress what was favorable to him. The instructions are as favorable to the defendant as the facts justify. We do not believe there has been any miscarriage of justice. The defendant has had a fair and impartial trial, and no substantial error has been committed. The judgment is accordingly affirmed.