Nancy WILLIAMS, Petitioner,

v.

DISTRICT COURT, EL PASO COUNTY, Colorado, and one of the Judges thereof, Honorable Robert Elliott, Respondents.

No. 84SA470.

Supreme Court of Colorado, En Banc.

May 28, 1985.

David F. Vela, Colo. State Public Defender, Michael J. Heher, Denver, Kenneth M. Plotz, Salida, Philip L. Dubois, Deputy State Public Defenders, Boulder, for petitioner.

Dennis E. Faulk, Dist. Atty., Roger Larsen, Asst. Dist. Atty., Canon City, Steven B. Rich, Deputy Dist. Atty., Fairplay, for respondents.

QUINN, Justice.

The petitioner, Nancy Williams, who is awaiting a new trial on a charge of second degree murder, filed this original proceeding under C.A.R. 21. She seeks an order directing the District Court of El Paso County to quash subpoenas served on a deputy public defender who is presently representing her in the pending criminal prosecution, two attorneys who formerly represented her on the criminal charge, and a public defender investigator. The subpoenas commanded the persons served to appear at the scheduled murder trial and to give testimony on behalf of the prosecution. We issued a rule directing the district court to show cause why the relief sought by the petitioner should not be granted. We now make the rule absolute in part and discharge the rule in part.

I.

The petitioner was charged in the District Court of Chaffee County with first

degree murder after deliberation[1] committed against her husband, Clint Williams, on January 27, 1981. Venue was changed to the District Court of Fremont County, where a jury trial resulted in a guilty verdict to the crime of second degree murder.[2] The prosecution's theory at trial was that the petitioner killed her husband in the family home on January 27, 1981, immediately left the home to visit relatives, and then returned to the home on February 13, 1981, when she reported her discovery of her husband's dead body to the police. The petitioner filed a motion for a new trial based on newly discovered evidence consisting of information received from a witness, Richard Martin, who allegedly saw the victim alive after January 27, 1981, when the petitioner was away from the family home. This new evidence contravened the prosecution's trial theory that the petitioner killed her husband at the family home on January 27, 1981, and upon her return from visiting relatives reported the discovery of his body to the police as a pretext to cover up her crime.

Richard Martin testified to the following facts during the hearing on the petitioner's motion for a new trial. He was a friend of the victim and was also acquainted with the petitioner. The last time he saw the victim was during a conversation with him on a street in Buena Vista, Colorado, on "February 4th, give or take a day." Martin subsequently heard of the victim's death on a radio newscast. When Martin later read in a newspaper article that the petitioner had been charged with the killing of her husband, he contacted Leonard Campbell, a Montrose attorney who was then representing the petitioner, and offered to appear as a witness if necessary. Because Martin at that time did not realize the significance of the date of his conversation with the victim, he did not convey this information to Attorney Campbell.[3] Nor, according to Martin, did he offer this information to Kenneth Plotz, the deputy public defender who was appointed by the court to represent the petitioner and served as trial counsel at the first trial.[4]

Following the guilty verdict returned by the jury, Martin again read newspaper accounts of the trial and realized for the first time the importance of the date on which he saw the victim. He accordingly contacted Attorney Plotz and conveyed this information to him. Martin acknowledged during his testimony that he signed an affidavit, prepared by Plotz, in which he stated that prior to trial he had not come forward with this information about having seen the victim on or about February 4, 1981, because at that time he did not realize its significance to the case. Martin was extensively cross-examined by the district attorney on his reason for not coming forward with this information earlier and also on the basis of his belief that he actually saw the victim on or about February 4.

█ Attorney Plotz also testified at the motion hearing, primarily to establish the legal predicates for the motion for a new trial on the basis of newly discovered evidence.[5] Plotz testified that he first became

---

1. § 18–3–102(1)(a), 8 C.R.S. (1978).

2. § 18–3–103(1)(a), 8 C.R.S. (1978).

3. The record shows that Campbell served in an advisory capacity during the first trial. Shortly after the first trial, Campbell was given permission by the court to withdraw from all representation.

4. Martin testified that he believed that Kenneth Baker, a Salida attorney, had represented the petitioner for a brief period after her arrest. Martin, of course, not then knowing the significance of the date of his encounter with the victim, made no effort to contact Baker.

5. A defendant seeking a new trial on the ground of newly discovered evidence must establish the following: the new evidence was discovered after the trial; the defendant and defense counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial; the newly discovered evidence is material to the issues in the case, and not merely cumulative or impeaching; and the newly discovered evidence will probably produce a different result on retrial. See, e.g., People v. Scheidt, 187 Colo. 20, 528 P.2d 232 (1974); DeLuzio v. People, 177 Colo. 389, 494 P.2d 589 (1972); Kelley v. People, 166 Colo. 322, 443 P.2d 734 (1968); Edwards v. People, 73 Colo. 377, 215 P. 855 (1923).

aware of the new evidence when Martin telephoned him at his home. Plotz stated that, because his children were running around the house and he was entertaining several friends who were engaged in conversation, he "tried to get in a place where I could hear and discuss the matter with [Martin] and I did." Plotz's recollection of the conversation was that Martin told him that "he had talked with Clint Williams during the first week of February 1981." On cross-examination by the district attorney, Plotz gave the following testimony:

Q Would it be fair to say that the statement during the first week of February, 1981, on the one hand and a statement that something happened on February 4th, 1981, are somewhat different in flavor and nuance?

A No, that wouldn't be fair at all. He may very well have said on the night he called me at home, February 4th. As I said before on direct examination, I wasn't expecting the call, I wasn't in the frame of mind to deal with the call immediately. There was a lot going on in my house and it is very difficult for me to remember exactly what he said on that night.

Plotz further testified that on another occasion Martin telephoned him at his office and left his address and phone number. Plotz later drafted a letter to Martin in which he requested specific information about the new evidence. Martin wrote a letter to Plotz in response and, according to Plotz, it was Martin's written response that Plotz used in preparing the affidavit ultimately signed by Martin and filed in support of the motion for a new trial.

The court, on the basis of the evidence elicited at the motion hearing, granted the petitioner's motion for a new trial and changed venue to the District Court of El Paso County where the matter was set for a jury trial on November 26, 1984. The prosecution thereafter served subpoenas on Plotz, the petitioner's former attorneys, Leonard Campbell and Kenneth Baker, and Thomas Ewing, a public defender investigator. Philip Dubois, a deputy public defend-er who was serving as co-counsel with Plotz, moved to quash the subpoenas on several grounds, including the following: that the prospect of Plotz testifying against the petitioner would create an ethical dilemma in relation to the continued representation of the petitioner by the public defender office; that the testimony from these witnesses would violate the attorney-client privilege and the work product doctrine; and that the testimony which the prosecution seeks to elicit from these witnesses is irrelevant. The prosecutor, during the hearing on the motion to quash, informed the court that he intended to call the subpoenaed witnesses at trial in order to prove that at no time prior to the first trial did Martin advise them of his alleged encounter with the victim. The prosecutor also advised the court that he intended to call Plotz in order to establish an inconsistency between Martin's testimony at the new trial hearing that he had seen the victim on "February 4th, give or take a day" and his telephone conversation with Plotz in which he told Plotz that the conversation with the victim occurred "during the first week of February." The prosecutor further told the court that he intended to examine Plotz at trial with respect to his other conversations with Martin and also the circumstances surrounding the execution of Martin's affidavit filed in connection with the motion for a new trial.

The respondent court denied the motion to quash. It ruled that although the subpoena served on Plotz may ultimately compel the public defender office to withdraw from the pending trial, the trial testimony of the subpoenaed witnesses would violate neither the attorney-client privilege nor the work product doctrine. We conclude that Plotz's present representation of the petitioner in the pending trial to which the subpoena is directed and the prosecution's failure to make a requisite showing that Plotz's trial testimony would be adverse to the petitioner and would likely be admissible at trial, as well as the absence of any compelling need for such testimony, render the respondent court's denial of the motion to quash the Plotz subpoena clearly errone-

ous. We accordingly make the rule absolute as to the subpoena served on Plotz. Because the considerations applicable to Plotz as present counsel for the petitioner are not present in the case of the other subpoenaed witnesses, we discharge the rule as to the subpoenas served on them.

## II.

Article VI, section 3 of the Colorado Constitution vests this court with the jurisdiction to issue original and remedial writs. The exercise of our original jurisdiction is discretionary and is necessarily governed by the particular circumstances of the case. *E.g., Neusteter v. District Court,* 675 P.2d 1 (Colo.1984); *Sanchez v. District Court,* 624 P.2d 1314 (Colo.1981); *Shore v. District Court,* 127 Colo. 487, 258 P.2d 485 (1953). We recognize that an order denying a motion to quash a subpoena is interlocutory in character, *People v. Hearty,* 644 P.2d 302, 312 (Colo.1982), and thus not ordinarily reviewable in an original proceeding. On occasion, however, we have entertained an original proceeding in connection with an interlocutory order when the order raises a substantial issue relating to the administration of criminal justice, *see, e.g., Osborn v. District Court,* 619 P.2d 41 (Colo.1980); *A v. District Court,* 191 Colo. 10, 550 P.2d 315 (1976), or places an accused at an unwarranted disadvantage in a pending criminal trial, *see, e.g., Corr v. District Court,* 661 P.2d 668 (Colo.1983); *Richardson v. District Court,* 632 P.2d 595 (Colo.1981).

We believe the exercise of original jurisdiction is appropriate under the circumstances of this case. The order denying the motion to quash not only poses a question of significant importance to the administration of justice in this state but also places the petitioner's present counsel in an ethical quandary as to the continued representation of the petitioner in the pending prosecution.

## III.

Application of the Code of Professional Responsibility is within a court's "general supervisory authority to ensure fairness to all who bring their cause to the judiciary for resolution." *Greenebaum-Mountain Mortgage Co. v. Pioneer National Title Insurance Co.,* 421 F.Supp. 1348, 1351 (D.Colo.1976); *see United States v. Springer,* 460 F.2d 1344 (7th Cir. 1972); *People v. Schultheis,* 638 P.2d 8 (Colo.1981); *Riley v. District Court,* 181 Colo. 90, 507 P.2d 464 (1973). Central to our analysis here are those ethical considerations that necessarily arise when an attorney of record is subpoenaed by opposing counsel in order to testify against the subpoenaed attorney's client in a pending trial.

Canon 5 of the Code states that "[a] lawyer should exercise independent professional judgment on behalf of a client." A lawyer's ability to exercise independent judgment is obviously placed in a compromising position if the lawyer's duty as an advocate becomes intermingled with his role as a witness in the same proceeding. The duty of the lawyer as an advocate is to represent his client "zealously within the bounds of the law." C.P.R. Canon 7. The responsibility of a witness, on the other hand, is to testify objectively to facts within the witness' knowledge. A lawyer who intermingles the functions of advocate and witness diminishes his effectiveness in both roles. The client's case is subject to the criticism that it is being presented through the testimony of an obviously interested witness who on that account is subject to impeachment, and, of equal importance, the lawyer is placed in the unseemly position of arguing his own credibility to the jury. *See People v. Garcia,* 698 P.2d 801 (Colo. 1985). Obviously, a lawyer's duty to exercise independent judgment on behalf of his client will be even more seriously jeopardized when the lawyer is called as a witness to give testimony *adverse* to his client.

DR 5–102 is intended to guide lawyers in those situations in which a lawyer becomes a witness in pending litigation. DR 5–102(A) provides in essence that a lawyer "shall withdraw" from the case when he "learns or it is obvious that he or a lawyer in his firm ought to be called as a witness

on behalf of his client."[6] This disciplinary rule is not involved in this case for the reason that the petitioner has no intention of calling her present or former attorneys as witnesses on her behalf during the trial.

■ The disciplinary rule critical here is DR 5–102(B), which states:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

A lawyer will rarely, if ever, be able to effectively serve as an advocate and give testimony adverse to his client in the same proceeding. *Riley,* 181 Colo. at 95, 507 P.2d at 466.[7] We emphasize, however, that DR 5–102(B) was neither intended nor designed as a procedural device for permitting a lawyer to subpoena opposing counsel as a witness for the sole purpose of disqualifying the subpoenaed lawyer as counsel in the pending litigation. *Kroungold v. Triester,* 521 F.2d 763, 766 (3d Cir.1975);

*Annotated Code of Professional Responsibility* DR 5–102(B) n. 31 (1979), citing *Galarowicz v. Ward,* 119 Utah 611, 620, 230 P.2d 576, 580 (1951). Indeed, the use of the subpoena power solely as a contrivance to disqualify opposing counsel could itself constitute unprofessional conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5).

■ We recognize that no preliminary showing is ordinarily required to subpoena a witness for trial testimony. *See Losavio v. District Court,* 188 Colo. 127, 533 P.2d 32 (1975); *People v. Ensor,* 632 P.2d 641 (Colo.App.1981). Such is not the case, however, when the prosecution subpoenas the accused's attorney to give testimony adverse to his client in a pending criminal prosecution. In view of the fact that a denial of a motion to quash will most likely result in the subpoenaed attorney's withdrawal from further representation of the accused, *see* DR 5–102(B), the practice of subpoenaing the accused's attorney as a prosecution witness, if not carefully monitored by the judiciary, could be converted into a device for forcing a particular lawyer to terminate his representation of the ac-

---

6. DR 5–102(A) states that, even if a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, the lawyer may nonetheless continue representation in the trial and he or a lawyer in his firm may testify under those limited circumstances enumerated in DR 5–101(B)(1) through (4). The circumstances in which a lawyer or a lawyer in his firm may testify and continue representation of a client are: (1) if the testimony relates to an uncontested matter; (2) if the testimony relates solely to a matter of formality where there is no reason to believe that substantial evidence will be offered in opposition to the testimony; (3) if the testimony relates solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client; and (4) if the testimony relates to any matter, so long as refusal to continue as trial counsel would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case. DR 5–101(B).

7. The American Bar Association Committee on Ethics and Professional Responsibility issued a formal opinion on DR 5–102 in 1975. The opinion states that there will be few situations in which accepting employment as trial counsel

can be justified if it is anticipated that the lawyer's testimony will be adverse to the client and then adds the following qualification:

Because there are degrees of "adverse" evidence, however, we are not prepared to hold that it would *never* be ethically permissible, but we note that with such employment the lawyer also accepts a heavy responsibility. The most skilled advocate cannot always accurately assess the impact of any testimony upon the trier of facts and the prejudice likely to result from the prospect of unfavorable testimony being elicited from a party's trial advocate must be carefully considered with the client. In this connection, the lawyer must, of course, consider carefully the effect on the client's cause of fulfilling his obligation as a witness to testify truthfully while honoring his correlative duty to maintain inviolate the client's secrets and confidences. (emphasis in original).

Any doubt that the lawyer has about the answer to the ethical question, whether it arises when employment is tendered or after representation has been undertaken, "should be resolved in favor of the lawyer's testifying and against his becoming or continuing as counsel." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 339 (1975).

cused. In this respect we note the following comments of the Second Circuit Court of Appeals in *In re Grand Jury Subpoena Served Upon John Doe, Esq.*, 759 F.2d 968, 975 (2d Cir.1985):

> In carefully weighing these important interests [the public interest in presenting all relevant information to the grand jury and the interest in preserving the attorney-client relationship under our adversary system of justice], two points support additional protection for the attorney-client relationship. First, the unbridled use of the subpoena would potentially allow the Government, in this and future cases, to decide unilaterally that an attorney will not represent his client. Such a power of disqualification can undermine and debilitate our legal system by subjecting the criminal defense bar to the subservience of a governmental agent. The unrestricted exercise of this power without adequate justification does not strike us as necessary or indispensable in an adversary system of criminal justice, particularly when we consider the significance of the attorney-client relationship and the need for an independent bar. Second, as noted earlier, the right to have counsel of one's choosing in the defense of a criminal charge is of constitutional dimensions. Thus, any potential infringement of this right must only be as a last resort.

 While indigent defendants have no right to an attorney of their choice, they are entitled to continued and effective representation by court appointed counsel in the absence of a demonstrable basis in fact and law to terminate that appointment. *See Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); §§ 21-1-103 to -105, 8 C.R.S. (1978 & 1984 Supp.). We believe, therefore, that the above quoted remarks on the matter of grand jury subpoenas are even more pertinent to a prosecutorial subpoena ordering the attorney of record for an accused to give testimony as a prosecution witness in the accused's upcoming trial. Defense counsel, whether retained or appointed, must not be inhibited in his ability to vigorously investigate the factual circumstances of the case without fear that he may inadvertently be gathering evidence for use against his client.

 Although the prosecution may not have taken the step of actually filing a formal motion to disqualify a defense attorney subpoenaed as a prosecution witness for trial, the act of subpoenaing defense counsel is itself, in our opinion, the functional equivalent of a motion to disqualify. "It is obvious that a lawyer cannot act as an advocate on behalf of his client, and yet give testimony adverse to the interests of that client in the same proceeding." *Riley*, 181 Colo. at 95, 507 P.2d at 466. The serious risk that such a practice poses to the integrity of the lawyer-client relationship in the administration of criminal justice leads us to conclude that a prosecutorial subpoena served upon an accused's attorney can withstand a motion to quash only if the prosecution demonstrates on the record the existence of the following factors to support the subpoena: (1) that defense counsel's testimony will be actually adverse to the accused;[8] (2) that the evidence sought to be elicited from the lawyer will likely be admissible at trial under the controlling rules of evidence;[9] and (3) that

---

8. The fact that the prosecution subpoenas defense counsel for trial testimony clearly indicates that the purpose of the subpoena is to elicit testimony adverse to the accused. The prosecution, however, should still bear the burden of demonstrating on a motion to quash that the testimony sought to be elicited will actually be adverse to the accused. Otherwise, defense counsel would be left in a state of uncertainty as to his ethical responsibility under DR 5–102(B). If the court finds that defense counsel's testimony will not be adverse to the accused, there would appear to be no legitimate need on the part of the prosecution for such testimony, and the subpoena served on defense counsel should accordingly be quashed. Quashing the subpoena under these circumstances permits defense counsel to resume his role as attorney unencumbered by the prospect of appearing as a witness in the case.

9. We recognize that a trial court will seldom be able to unconditionally determine in advance of trial whether various forms of impeachment

there is a compelling need for such evidence, which need cannot be satisfied by some other source. *See United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975) (defendant's calling of government counsel as a witness justified only when required "by a compelling and legitimate need"); *United States v. Torres*, 503 F.2d 1120, 1126 (2d Cir.1974) (reversible error to permit government to call as impeachment witness prosecutor sitting at government counsel table during trial, the court noting that such a practice is permissible "only if and when a proper foundation has been laid for impeachment and all other sources of possible testimony have been exhausted"); *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 624 P.2d 296 (1981) (a motion to disqualify opposing counsel under DR 5–102(B) on basis of calling attorney as witness for other party "must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client"). In order to permit meaningful appellate review of a ruling on a motion to quash a prosecutorial subpoena served on the accused's attorney for trial testimony, or, for that matter, on a motion to disqualify under DR 5–102(B), the trial court should make specific findings of fact and conclusions of law pursuant to the standard herein adopted.

## IV.

■ We turn then to the record in this case in order to determine whether the respondent court properly denied the motion to quash the subpoena served on Plotz.

The prosecution represented to the respondent court that it subpoenaed Plotz as a prosecutorial trial witness for two reasons. The first reason is to prove that Martin, at no time prior to the first trial, advised Plotz of his February 4 encounter with the victim. Martin's delay in furnishing Plotz with this information, however, is simply not a contested issue in the case. Indeed, one of the requisites of a motion for a new trial on the ground of newly discovered evidence is that the evidence was neither discovered nor reasonably discoverable prior to the first trial. *E.g., People v. Scheidt*, 187 Colo. 20, 528 P.2d 232 (1974). The petitioner, therefore, when she filed a motion for a new trial, conceded that Martin never came forward with his evidence prior to the first trial. Any further testimony from Plotz on this point could not conceivably be adverse to the petitioner.

The second asserted reason for the prosecutorial subpoena served on Plotz is to establish an alleged inconsistency between Martin's anticipated trial testimony that he saw the victim on "February 4th, give or take a day," as he testified at the hearing on the motion for a new trial, and Martin's initial telephonic statement to Plotz, as recounted by Plotz at the new trial hearing, that Martin's encounter with the victim occurred "during the first week of February." Considered by itself, Martin's telephonic statement to Plotz is, if anything, facially beneficial to the petitioner. It could be considered adverse to the petitioner only if, as the prosecution contends, it is inconsistent with Martin's former testimony that he saw the victim on "February 4th, give or take a day." The prosecution's intent, therefore, is to use Plotz as a rebuttal witness who may be called to testify, if

---

evidence will be admissible. This is especially true in the case of impeachment evidence in the form of an alleged prior inconsistent statement. *See* CRE 613(a). Thus, when a court is faced with a motion to quash a subpoena served on the accused's counsel who supposedly can testify as a prosecutorial rebuttal witness to a prior inconsistent statement made by a defense witness, the court must necessarily consider the significance of the particular testimony which the prosecution seeks to impeach. In resolving

this issue, the court in its discretion may balance the importance of the impeachment evidence against the delay and possible disadvantage that might inevitably result from denying the motion to quash and requiring the entry of new counsel for the accused. This discretionary balancing should be employed, however, only when it is clear that defense counsel's testimony will be actually adverse to the accused and that there is no other source for the impeaching evidence.

at all, only in the event Martin denies having told Plotz that he saw the victim "during the first week of February." CRE 613(a) (no impeachment by extrinsic evidence of prior statement if witness admits making the prior statement).

While the issues relating to the adverse effect of defense counsel's anticipated trial testimony on his client and the admissibility of such evidence at trial will ordinarily involve independent considerations, these issues under the peculiar circumstances of this case collapse into one question. That question is whether Martin's telephonic statement to Plotz is inconsistent with Martin's testimony given at the hearing on the motion for a new trial. We are satisfied that Martin's telephonic statement to Plotz does not qualify as a prior inconsistent statement and that, therefore, Plotz's testimony would be neither adverse to the petitioner nor admissible at trial under the controlling rules of evidence.

The theory of impeachment by prior inconsistent statement is based on the notion that "talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements." *McCormick on Evidence* 74 (E. Cleary 3d ed. 1984). Although an inconsistency need not amount to a patent contradiction, there must be a material variance between the witness' testimony and the prior statement or at least the omission of a significant detail which it would have been natural to mention in the prior statement. *Id.* at 74–75; *see People v. Cole*, 195 Colo. 483, 584 P.2d 71 (1978); *Rose v. Otis*, 18 Colo. 59, 31 P. 493 (1892). A fair reading of Plotz's testimony, given at the hearing on the motion for new trial, is that Martin might well have said in his initial conversation with Plotz that he saw the victim on February 4, but that Plotz's recollection of the conversation was that Martin told him "he had talked with Clint Williams during the first week of February." Even if Martin made the latter statement, however, we judicially notice the fact that the first day of February 1981 was a Sunday. CRE 201(b). Any

statement by Martin that he saw the victim "during the first week of February" cannot reasonably be translated, as urged by the prosecution, into a statement that Martin's encounter with the victim might have occurred on or before January 27, the alleged date of the victim's death. Thus, Plotz's prospective trial testimony regarding his telephone conversation with Martin would not constitute evidence of a prior inconsistent statement by Martin that was materially at variance with Martin's former testimony that he saw the victim "on February 4th, give or take a day." There being no demonstrated inconsistency between the statements made by Martin, there is no basis to conclude that Plotz's testimony would be adverse to the petitioner or would be admissible at trial as a prior inconsistent statement.

Our determination that Plotz's testimony would be neither adverse to the petitioner nor admissible at trial renders it unnecessary for us to consider whether the third prong of the applicable standard has been satisfied. We nonetheless deem it appropriate to briefly comment on the matter of the prosecution's alleged need for Plotz's trial testimony. Even if we assume *arguendo* that Plotz's trial testimony would satisfy the requirements of adversity and admissibility, a premise which we find untenable, the fact remains that Plotz's only function at trial would be to serve as a rebuttal witness whose testimony itself would be subject to the contingency that Martin would deny making the prior statement to Plotz about seeing the victim "during the first week of February." The prosecution, however, has available to it a considerable amount of information, independent of Plotz's putative trial testimony, concerning the date of Martin's alleged conversation with the victim. Martin's prior testimony given at the hearing on the motion for a new trial consists of some seventy-two pages, much of which is related to the date of his encounter with the victim in Buena Vista. In addition, there is evidence in the record that Martin wrote a letter to Plotz in which he provided the details of his meeting with the victim. The

prosecution is certainly not precluded from requesting the trial court to permit, in its discretion, an inspection of this letter prior to commencing its cross-examination of Martin at trial. *See United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

■ The sources of evidence available to the prosecution are more than adequate to provide it with a fair opportunity to meet the testimony of Martin at trial. To require Plotz to make himself available as a possible impeachment witness for the prosecution would be tantamount to unnecessarily terminating the lawyer-client relationship presently existing between Plotz and the petitioner, a result that offers no countervailing benefits to the administration of justice and could seriously disadvantage the petitioner in the pending criminal prosecution. The subpoena served on Plotz must therefore be quashed.[10]

### IV.

We find it unnecessary in this case to address that aspect of the respondent court's order denying the motion to quash the subpoenas served on the petitioner's former attorneys and the public defender investigator. The subpoenas served on these witnesses pose no threat to the continued lawyer-client relationship existing between the petitioner and her present counsel. Questions relating to whether the interrogation of any of these witnesses might call for privileged information or for material protected by the work product doctrine are matters for the respondent court to determine at the time of trial. *See Losavio,* 188 Colo. 127, 533 P.2d 32. We of course intimate nothing in regard to the

admissibility of any testimony which the district attorney might seek to elicit from these witnesses.

The rule is made absolute with respect to the subpoena served on the petitioner's present attorney, Deputy Public Defender Plotz, and is discharged as to the subpoenas served on the other witnesses.

---

**10.** During the hearing on the motion to quash, the prosecution's position was that it also desired to question Plotz at trial concerning any other conversations, in addition to the initial telephone call, between Plotz and Martin and also about the circumstances surrounding the execution of Martin's affidavit filed in support of the motion for a new trial. Such an inquiry, however, has all the characteristics of a speculative and far ranging search into areas that, so far as the record shows, are considerably removed from the factual issues underlying the

charge of second degree murder. Furthermore, the chilling effect that such a practice can have on the legitimate investigative efforts of defense counsel on behalf of his client are quite obvious to even the most casual observer. *See United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In view of our decision that the subpoena served on Plotz must be quashed, we see no purpose in further discussing this aspect of the proceeding below.