**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Abraham HAGOS, Defendant–Appellant.**

**No. 05CA2296.**

Colorado Court of Appeals, Div. II.

Oct. 29, 2009.

As Modified on Denial of Rehearing Feb. 18, 2010.

598

602

John W. Suthers, Attorney General, Elizabeth Rohrbough, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Reppucci Law Firm, P.C., Jonathan D. Reppucci, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

Defendant, Abraham Hagos, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder, attempted first degree murder, conspiracy to commit first degree murder, and two counts of witness retaliation. We remand for further proceedings.

Defendant and the victim were involved together in the sale and distribution of drugs. During execution of a search warrant for the victim's residence in Jefferson County, police seized a safe containing over $7,000 in cash, quantities of cocaine and methamphetamine, and a gun. The victim subsequently cooperated with police and implicated defendant. His cooperation extended to giving preliminary hearing testimony in a drug case against defendant initiated in Jefferson County.

Defendant determined to have the victim killed and sought assistance to do so from numerous persons, including Matthew Conner, a friend of the victim, and members of an ethnic Cambodian gang. Defendant offered to pay $10,000 for the killing. One gang member, Kosal So, took the money and agreed to kill the victim. Following additional discussions, defendant agreed to pay So another $10,000 and provided a gun that So and another gang member, Samnang Prim, could use to commit the crime. So also solicited the assistance of a person called Ley.

The day before a motions hearing in the Jefferson County drug case, So took Prim and Ley to a location near the victim's residence. The victim, who had been invited by Conner to go out with him that evening to facilitate the opportunity for the killing, observed the men at a bus stop, and after the victim climbed into Conner's car, shots were fired at the victim and the victim returned fire. No one was hit. Police responded to the incident and obtained a statement from the victim as part of their investigation.

The next day, the victim went to court for the motions hearing and, while waiting in a room near the courtroom, he observed defendant come to the window of the waiting room and make a gesture to the victim pretending to shoot a gun to the head. He reported the gesture to the prosecutor.

Two days later, So picked up Prim and drove him to the victim's workplace. Prim ran to where the victim was preparing to park his car and fired multiple shots into the car, killing the victim. After confirming the victim's death, defendant paid So the remaining $10,000, $5,000 of which So paid to Prim.

Conner confessed to his role in the two shootings, pleaded guilty to attempted first degree murder, and agreed to testify against defendant. Police arrested So, who admitted his own involvement, pleaded guilty to second degree murder, and agreed to testify against defendant. Likewise, Prim admitted his involvement, but asserted his Fifth Amendment rights when he was ultimately called to testify in the trial against defendant.

Defendant was charged in Denver in connection with the shootings and the prosecution filed notice that it would seek the death penalty. The trial court appointed the Office of the State Public Defender (PD), including attorney F., to represent defendant. During pretrial proceedings, attorney F. became aware that the prosecution had a witness, R.N., who proposed to testify that defendant had admitted his role in the killing during a jailhouse conversation. Attorney F. interviewed R.N.'s wife, P.N., several times while she was also incarcerated, attempting to determine if she might be able to impeach R.N. On one occasion, just before attorney F. interviewed her without an investigator present, P.N. had momentary contact with defendant, who had emerged from an attorney-client conference with attorney F. at the jail. Shortly after that meeting, P.N. told prosecutors that attorney F. had threatened her during the interview. The next day, the prosecution moved to disqualify attorney F. and the PD from the case.

Attorney F. adamantly denied making any such statements. During one of the multiple hearings on the disqualification motion, P.N.

reported seeing defendant threaten her while she was testifying by silently mouthing to her from the defense table, "You're dead"; however, no one else observed it. Nevertheless, following investigation of the supposed threat, the PD moved to disqualify the trial judge, contending among other things that he would be a witness in the matter.

The trial court denied the motion to disqualify. It also determined that attorney F. had created a conflict of interest by interviewing P.N. alone, making himself a witness in the case. Although defendant wanted attorney F. to remain as his attorney, he rejected the trial court's proffered solution to commit not to call P.N. as a witness as a condition of keeping attorney F. and the PD. Accordingly, the trial court disqualified attorney F. and the PD office and appointed Alternate Defense Counsel (ADC) to represent defendant.

One of the ADC attorneys disclosed to the court that he had formerly represented one of the prosecutors and members of his family, as well as one of the case investigators, all in civil matters. He represented that he had explained this to defendant and that defendant was willing to waive any potential conflict. Defendant then entered a plea of not guilty.

Approximately seven months later (three months before trial), the ADC attorneys moved to withdraw from the case, asserting a conflict of interest. They requested and were granted an ex parte hearing in front of a different judge and without prosecutors being present. However, the attorneys declined specifically to identify any reason for their conflict of interest claim, and the independent judge denied the motion. Defendant indicated he wanted the ADC attorneys to remain on his case.

After the court determined to admit some evidence from the Jefferson County drug case, defendant filed a motion to suppress, challenging the validity of the search warrant issued for the search of the victim's residence. The trial court denied the motion.

Before trial, the prosecution moved to admit particular hearsay and non-hearsay statements. The court concluded that the victim's preliminary hearing testimony from the Jefferson County drug case would be admissible as non-hearsay, and that some of Prim's out-of-court statements might be admissible if a proper foundation were laid. The court also indicated that the victim's statements concerning the bus stop shooting and the threatening gesture defendant purportedly made at the Jefferson County courthouse would be admissible.

The jury convicted defendant after trial. Following defendant's conviction and before any sentencing proceeding, the Supreme Court announced its decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), holding that an Arizona statute allowing for a judge, rather than a jury, to find aggravating factors necessary to impose the death penalty, violated the Sixth Amendment. The trial court concluded, based on *Ring*, that the prosecution could not seek the death penalty here, and the supreme court affirmed that determination. *People v. Hagos*, 110 P.3d 1290 (Colo.2005).

Following trial, defendant filed a pro se motion to dismiss counsel based upon the ADC attorneys' prior representation of members of the prosecution's team. The court denied that motion, but later permitted those ADC attorneys to withdraw for other reasons.

Defendant filed a motion requesting the return of $2,705 taken from him when he was arrested in a different case. In addition to imposing a life sentence without possibility of parole, the court ordered restitution in the amount of $2,223.05, payable to the Victim's Compensation Board, and ordered that amount to be taken from the money seized from defendant and held by the police department. This appeal followed.

## I. Heightened Due Process Concerns

Citing *Dunlap v. People*, 173 P.3d 1054 (Colo.2007), and *People v. Harlan*, 8 P.3d 448, 461 (Colo.2000) (*Harlan I*), defendant contends that heightened due process considerations apply to this case because the death penalty was potentially available. However, the state no longer has the ability to impose the death penalty on defendant. *Hagos*, 110 P.3d at 1290.

Defendant nevertheless cites *People v. Reynolds,* 159 P.3d 684, 688 (Colo.App.2006), for the proposition that "case law has defined 'capital case' to mean a case in which a sentence of death is potentially available under the statutes applicable to the offense, regardless of the constitutional availability of the death penalty." Regardless of *Reynolds's* applicability here, defendant has not identified any heightened considerations that should apply or specifically how we should treat this case differently from any other. Consequently, we reject the contention.

## II. Disqualification of Counsel

Defendant contends that the trial court abused its discretion by disqualifying the PD from representing him. Because we conclude the trial court's finding that attorney F. was likely to be called as a necessary defense witness was within its discretion, we disagree.

### A. Relevant Facts

The trial court found that the PD was requesting that P.N. appear as a witness to discredit the proposed testimony of her husband, R.N. It also concluded that the encounter between defendant and P.N. at the jail, as well as attorney F.'s assertedly intimidating statements, could suggest a possible motivation for P.N. to testify at trial in a particular way. Consequently, the trial court found that if the prosecution called R.N., and defendant then called P.N. to discredit him, the prosecution could cross-examine P.N. about her motivations for testifying. Were that the case, attorney F. could become a witness because he alone was present with P.N. for some of the interactions that could have influenced her. Specifically, the court found:

> [Attorney F.] would then become a witness: (1) for the defendant. He could become a witness for the defendant in order to explain away any suggestions which were raised by the testimony of [P.N.] and the cross-examination. (2) He could become a witness for the People to be called to confirm those matters which she testified that he had said and he had done.

The trial court thus disqualified the PD and attorney F. from representing defendant.

### B. Standard of Review

Trial courts have broad discretion in ruling on a motion for disqualification. *People v. Harlan,* 54 P.3d 871, 877 (Colo. 2002) (*Harlan II* ). Thus, we review a trial court's order regarding disqualification for abuse of discretion. *Id.* A trial court abuses its discretion only when it acts in a manner that is manifestly arbitrary, unreasonable, or unfair, *People v. Ibarra,* 849 P.2d 33, 38 (Colo.1993), or when it misapplies the law. *People v. Maestas,* 199 P.3d 713, 716 (Colo. 2009).

### C. Applicable Law

While there is no Sixth Amendment right for an indigent defendant to choose his appointed counsel, a defendant is "entitled to continued and effective representation by court[-]appointed counsel in the absence of a demonstrable basis in fact and law to terminate that appointment." *Williams v. Dist. Court,* 700 P.2d 549, 555 (Colo.1985). As a result, once counsel is appointed, the attorney-client relationship "is no less inviolable than if the counsel had been retained by the defendant." *People v. Isham,* 923 P.2d 190, 193 (Colo.App.1995). There is thus a presumption in favor of a defendant's choice of counsel. *Tyson v. Dist. Court,* 891 P.2d 984, 990 (Colo.1995) (citing *Wheat v. United States,* 486 U.S. 153, 163–64, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). The presumption extends to indigent defendants: A defendant's desire for continued representation by a court-appointed public defender is "entitled to great weight." *Rodriguez v. Dist. Court,* 719 P.2d 699, 707 (Colo.1986). However, the presumption may be overcome by a showing of an ethical conflict or a potential for conflict. *Harlan II,* 54 P.3d at 878.

A trial court may not disqualify counsel on the basis of speculation or conjecture. Disqualification may only occur after facts are alleged that demonstrate the potential violation of a rule of professional conduct. *Id.* at 877. The burden of establishing that disqualification is proper is on the moving party. That burden is only met when the motion to disqualify sets forth specific facts that "point to a clear danger that either

prejudices counsel's client or his adversary." *People ex rel. Woodard v. Dist. Court,* 704 P.2d 851, 853 (Colo.1985).

Rule 3.7 of the Colorado Rules of Professional Conduct requires that a lawyer "shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness," with exceptions not applicable here. Colo. RPC 3.7(a). This rule is primarily intended to protect the interests of clients, for "a lawyer who intermingles the functions of advocate and witness diminishes his effectiveness in both cases." *Fognani v. Young,* 115 P.3d 1268, 1272 (Colo.2005) (quoting *Williams,* 700 P.2d at 553). Additionally, combining these two roles can both interfere with the tribunal and prejudice the opposing party. *See* Colo. RPC 3.7 cmt. 1; *Fognani,* 115 P.3d at 1272.

■ Courts have historically been highly cynical about motions to disqualify opposing counsel. *Fognani,* 115 P.3d at 1272. Consequently, allegations that opposing counsel is a "necessary witness" for purposes of Rule 3.7 cannot rest on the mere naming of the attorney. *Id.* at 1273. A court's determination of whether a moving party has properly demonstrated that opposing counsel is "likely to be a necessary witness" involves "a consideration of the nature of the case, with emphasis on the subject of the lawyer's testimony, the weight the testimony might have in resolving disputed issues, and the availability of other witnesses or documentary evidence which might independently establish the relevant issues." *Id.* at 1274.

■ An attorney in a criminal case could potentially become a witness for either the defense or the prosecution. A prosecutor's act of subpoenaing defense counsel—because of the difficulties inherent in an attorney serving as both an advocate and a witness—is the functional equivalent of a motion to disqualify. *Williams,* 700 P.2d at 555. Such a subpoena can survive a motion to quash only when the moving party proves "(1) that defense counsel's testimony will be actually adverse to the accused; (2) that the evidence sought to be elicited from the lawyer will likely be admissible at trial under the controlling rules of evidence; and (3) that

there is a compelling need for such evidence, which need cannot be satisfied by some other source." *Id.* at 555–56 (footnotes omitted).

### D. Application

#### 1. Standing

■ As an initial matter, we reject defendant's contention that the prosecution lacked standing to challenge the PD's representation. Although the prosecution's initial motion reads more like an allegation of misconduct than a motion under Colo. RPC 3.7, the trial court made clear that misconduct was not the basis for its decision. Rather, the motion was ultimately argued and decided in the context of advocate-witness and conflict of interest concerns, which the prosecution has standing to raise. *Cf. People v. Witty,* 36 P.3d 69, 73–74 (Colo.App.2000) (a defendant has standing to move for disqualification of a prosecutor).

#### 2. Colo. RPC 3.7

■ We disagree with the trial court's conclusion that the prosecution could have called attorney F. as a witness. In order to call attorney F., the prosecution had to demonstrate that his testimony would be adverse to defendant and admissible at trial, and that a compelling need for the testimony existed. *Williams,* 700 P.2d at 555–56. Even assuming adversity and admissibility, the prosecution did not demonstrate a compelling need for attorney F.'s testimony.

Attorney F.'s testimony could only be useful to the prosecution to discredit P.N.'s expected attack on R.N.'s credibility. This would presumably involve attorney F. explaining how he intimidated and threatened P.N., which he categorically denied that he ever did. Moreover, P.N.'s testimony of a threat from defendant or from attorney F. would have provided all the information the prosecution could conceivably have wanted. Hence, we disagree with the trial court on this point.

■ However, the trial court's conclusion that defendant would likely have a compelling need to call attorney F. was within its discretion. Counsel for defendant clearly

stated that if the prosecution called R.N., as it said it would, defendant would call P.N. Had P.N. testified, she may have stated—on either direct or cross-examination—that attorney F., defendant's lawyer, had attempted to intimidate her. That testimony, in a case concerning the murder of a potential witness against defendant, could have cast not only defendant but also attorney F. under an ominous cloud in the eyes of the jury. Defendant would have then needed to call attorney F. in an effort to rebut P.N.'s claims of intimidation.

We acknowledge that this analysis involves several layers of hypothesis. However, the language of Colo. RPC 3.7 calls upon courts to determine who is "likely" to be a "necessary" witness. The unpredictable nature of jury trials and the ebb and flow of strategy and tactics render it impossible conclusively to determine in advance whose testimony will actually be likely or necessary. Considering the nature of the principal case and the subject matter of attorney F.'s potential testimony, *see Fognani,* 115 P.3d at 1274, we conclude that the trial court's finding was not manifestly arbitrary, unreasonable, or unfair.

Defendant asserts that he had evidence other than attorney F.'s testimony that would have impeached P.N.'s assertion of attorney F.'s alleged threats, thereby eliminating the necessity of attorney F.'s testimony. However, he has not identified any such evidence, nor has he directed us to any part of the record where such evidence is located. P.N.'s prior felony convictions, which were known by all parties before the trial court's determination, would have equally impacted both the prosecution and defendant.

 The "substantial hardship" exception to Colo. RPC 3.7(a)(3) has not been proved. When determining whether disqualification of an attorney would impose a substantial hardship on a party, we consider "all relevant factors in light of the specific facts before the court, including the nature of the case, financial hardship, giving weight to the stage in the proceedings, and the time at which the attorney became aware of the likelihood of his testimony." *Fognani,* 115 P.3d at 1275.

Here, defendant was originally represented by the highly capable PD. Upon their disqualification, he was assigned two equally skillful private defense attorneys. Because defendant was indigent, financial hardship was not a factor. The disqualification took place early in the proceedings, before defendant had entered a plea, and although defendant repeatedly expressed his preference for the PD, we conclude that the trial court did not abuse its discretion by finding no substantial hardship existed.

### 3. Other Arguments

Defendant argues that the trial court had a reasonable alternative, which was to forbid testimony regarding P.N.'s meetings with attorney F., either on the basis of CRE 403 or in accordance with *People v. Martinez,* 869 P.2d 519, 528 (Colo.1994) (trial court's decision to prohibit both sides from raising an issue was within its discretion). However, defendant asserted that if the prosecution called R.N., then he would call P.N. Had P.N. been called, her motives for testifying and whether she had been intimidated into giving impeaching testimony would have been relevant and admissible. The proffered "other alternatives" would have unduly limited admissible evidence.

Defendant also argues that the trial court could have resolved the dilemma by allowing him to agree not to call attorney F. as a witness. But defendant has not provided us a record citation indicating that he proposed that option to the trial court. Moreover, had P.N. testified that attorney F. had intimidated her, an agreement by defendant not to call attorney F. could in turn have impacted defendant's constitutional right to present a defense.

 Also, we have found no precedent holding that the trial court was obligated to present defendant with multiple options for resolving this issue. The essence of a discretionary decision is that the trial court can choose among valid options in resolving an issue. *See People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987). That the trial court presented defendant with the option of not calling P.N., or forgoing representation by the

PD, was not arbitrary, unreasonable, or unfair.

Nor did the trial court's ruling offend the Sixth Amendment. Although indigent defendants have a presumptive right to continued representation by court-appointed counsel, that presumption may be overcome by a showing of a potential conflict. *Harlan II*, 54 P.3d at 878. Had the conflict developed—attorney F. serving as both counsel and a necessary witness—the decision to replace conflicted counsel would not have been defendant's alone. *See Horaist v. Doctor's Hosp.*, 255 F.3d 261, 266 (5th Cir.2001) ("If a lawyer must testify adversely to a client's interest, the client cannot waive the conflict."); *Freeman v. Vicchiarelli*, 827 F.Supp. 300, 305 (D.N.J.1993) (regardless of client's consent, attorney cannot avoid application of advocate-witness rule when not testifying would weaken the client's case); *contra National Corporate Tax Credit Fund VII v. Busching*, 2006 WL 1541392 at *2 (S.D. Miss. No. 3:04-CV-559BN, June 1, 2006) (unpublished opinion and order) (attorney must be disqualified unless all parties are willing to stipulate to the court that he will not be called as a witness at trial).

Hence, we reject defendant's suggestion that the trial court should have refrained from disqualifying the PD prior to trial and allowed him to "make a difficult choice" if P.N. had been called to testify. To do so would have created the potential of a mistrial.

We also disagree with defendant's claim that the trial court misadvised him of the potential dilemma, and, consequently that he could not voluntarily waive his right to continued representation by the PD. We conclude the trial court's advisement was adequate. *See People v. Alengi*, 148 P.3d 154, 159 (Colo. 2006).

### III. Disqualification of Trial Judge

Defendant contends that the trial judge erred by denying his motions to recuse. We disagree.

### A. Relevant Facts

The trial court conducted a pretrial hearing at which both defendant and P.N. were present. During the hearing, P.N. told her attorney that defendant twice silently mouthed the words "you're dead" to her in the courtroom. P. N.'s attorney promptly interrupted the proceedings and informed the court.

The trial court directed either P. N.'s attorney or the prosecution to "report that to the police authorities" (the record is unclear as to whom the court was speaking), and ordered an investigation. The court then made a record of everyone who was present in the courtroom and denied later-filed motions seeking recusal.

### B. Standard of Review

■ We review de novo a trial court's ruling on a motion to disqualify a judge. *People v. Julien*, 47 P.3d 1194, 1197 (Colo. 2002).

### C. Applicable Law

An accused has a constitutional right to an impartial judge at all stages of the proceedings against him. *See Tumey v. Ohio*, 273 U.S. 510, 522, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

A judge shall be disqualified from hearing a case if he or she is in any way interested or prejudiced with respect to the case, the parties, or counsel. § 16-6-201(1)(d), C.R.S.2009; Crim. P. 21(b)(1)(IV). Additionally, a judge "should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," including where the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." C.J.C. 3(C)(1).

■ A motion for disqualification must be supported by two affidavits from credible persons not related to the defendant, stating facts showing grounds for disqualification. § 16-6-201(3), C.R.S.2009. When ruling on such a motion, a trial court must accept as true the factual statements contained in the motion and supporting affidavits. *Julien*, 47 P.3d at 1199. The court must then deter-

mine as a matter of law whether the statements allege legally sufficient facts to warrant disqualification. *Id.*

 Legally sufficient facts are those "from which it may reasonably be inferred that the respondent judge has a bias or prejudice that will in all probability prevent him or her from dealing fairly with the petitioner." *Carr v. Barnes,* 196 Colo. 70, 72, 580 P.2d 803, 804 (1978). Prejudice is a leaning toward one side of a question involved, and must be distinguished from the sort of personal opinions that arise as a matter of course during a judge's hearing of a case. *Smith v. District Court,* 629 P.2d 1055, 1057 (Colo.1981).

### D. Application

Defendant contends that the two affidavits filed in support of his motion to disqualify the trial judge, taken as true, adequately show that the judge was not impartial, could have potentially been a witness in the case, and infringed upon the constitutional separation of powers. We disagree.

#### 1. Partiality

 We reject defendant's argument that the allegation of his threats created partiality. It is hardly rare for criminal defendants to utter distasteful, offensive, or even criminal words inside of courtrooms. Colorado precedent makes clear that even a defendant's direct threats to a judge's safety do not render that judge biased against him. *See Smith,* 629 P.2d at 1057. Thus, the trial judge's presence in a courtroom in which defendant allegedly threatened a witness does not require recusal.

Contrary to defendant's contention, the affidavits do not presumptively establish partiality. They establish that the court ordered an investigation to be done, but they do not establish that the court exercised any supervision over an investigation, nor do they reveal that the court actively participated in the investigation. One affidavit was authored by an investigator for the PD, who interviewed the judge. That affidavit indicated that the judge did not personally observe or hear any threats during the hearing, and that he did not observe any change in P.N.'s demeanor following the alleged threats because her hair was in front of her face. The affidavit indicates the judge only observed P.N. move her chair further away from defendant.

The affidavit avers that the judge questioned why the investigator was working for the PD and indicated that he had not authorized the PD to hire anyone to conduct an investigation, and that he expressed concern about whether the investigator would be paid for her work. However, contrary to defendant's assertions, nothing in the affidavit demonstrates a manifestation of bias or scorn.

Defendant's reliance upon *In re Estate of Elliott,* 993 P.2d 474, 481–82 (Colo.2000), for a different result is misplaced. Here, in contrast to the facts in that case, the trial judge did not prejudge defendant's guilt, nor did he allow any personal feelings toward defendant to affect his judgment. There is no indication that the judge had become personally embroiled in the controversy over whether threats had been made. And the mere order for an investigation did not create a potential conflict of interest or indicate that the judge might become a witness in any prosecution.

#### 2. Judge as Witness

 A judge must disqualify himself or herself if he or she has personal knowledge of any disputed evidentiary facts. C.J.C. 3(C)(1)(a). Here, however, the trial judge told defendant's investigator that he did not see defendant make the alleged threats and had no personal knowledge of whether they actually were made.

Defendant asserts that the judge was a potential witness whether he observed the threats or not, because the judge's failure to observe them means it is less likely that threats actually were made. But allowing litigants to disqualify a judge for that reason— so that the judge could testify to seeing and hearing nothing—would encourage unscrupulous judge-shopping. Moreover, the affidavits merely aver that "the court was in a position to determine if actions of Mr. Hagos, at the time the threats were allegedly

made[,] were consistent or inconsistent with the threats allegations." This does not establish the judge's knowledge of disputed facts.

Additionally, we note that by the time the court ruled on the recusal motion, the prosecution had stated that it would initiate no criminal proceedings as a result of the incident.

Consequently, we conclude there was no legally sufficient reason for disqualification in the affidavits attached to defendant's motion for disqualification.

### 3. Separation of Powers

We also reject defendant's argument that the trial judge violated the doctrine of separation of powers by ordering an investigation into the alleged threats.

Absent exceptions not relevant here, the prosecution cannot be controlled by judicial intervention. *People v. Zapotocky*, 869 P.2d 1234, 1244 (Colo.1994). However, trial court judges are vested with authority to operate and supervise their courtrooms. *See Halaby, McCrea & Cross v. Hoffman*, 831 P.2d 902, 907 (Colo.1992) ("a judge has all the powers reasonably required to efficiently run the court").

When the judge here was informed of the potential threats, he ordered the parties to "report that to the police authorities," and recorded the identity of those present in the courtroom. The judge did not supervise or participate in the investigation, stating: "I am not going to conduct it. That's not the business of the Court. The business of the court is to identify the witnesses and to direct that an investigation be undertaken."

Therefore, we conclude the court did not violate the separation of powers doctrine.

### IV. Appointed Counsel's Conflict of Interest

Defendant next contends the trial court erred by failing to advise him concerning ADC's conflict of interest that arose from counsel's previous representation of the prosecutor and an advisory witness. We agree the court should have advised defendant.

However, because defendant has failed to establish that an actual conflict of interest existed, we conclude that reversal is not required.

### A. Standard of Review

We review de novo the trial court's determination of whether an actual conflict existed, but we review the court's findings of fact under a clear error standard of review. *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 480 (10th Cir.1990); *see People v. Castro*, 657 P.2d 932, 943 (Colo.1983) ("If an accused demonstrates that his lawyer labored under an actual conflict of interest during the trial, a showing of actual prejudice is not a condition for relief.").

### B. Applicable Law

A lawyer has a conflict of interest when his or her loyalties are divided. *See* Colo. RPC 1.7, 1.9; *People v. Edebohls*, 944 P.2d 552, 556 (Colo.App.1996). Conflicts are classified as either actual or potential. "An actual conflict of interest is one that is 'real and substantial,' whereas a potential conflict is one that is 'possible,' is 'nascent,' or 'in all probability will arise.'" *People v. Kelling*, 151 P.3d 650, 657 (Colo.App.2006) (quoting *Harlan II*, 54 P.3d at 878).

A conflict of interest can arise when a defense attorney has previously represented a prosecution witness because of the duty of confidentiality that survives termination of an attorney-client relationship. *Dunlap*, 173 P.3d at 1070. An attorney has a continuing duty to keep confidential any information learned during the prior representation of the witness. Colo. RPC 1.6, 1.9; *Dunlap*, 173 P.3d at 1070. "This duty creates the possibility that the attorney will be hindered in cross-examining the witness, which thus impedes the attorney's ability to zealously represent the current client." *Dunlap*, 173 P.3d at 1070.

"Once a trial court is put on notice of a potential conflict of interest between the defendant and defense counsel, it has a duty to inquire into the propriety of continued representation by counsel." *Kelling*, 151 P.3d at 657. However, where a trial court

fails to inquire into a potential conflict, "a defendant, to obtain reversal, must show that counsel was subject to an actual conflict of interest that adversely affected counsel's performance on behalf of the defendant." *Id.* (citing *Mickens v. Taylor*, 535 U.S. 162, 170–76, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)).

## C. Application

 Here, the trial court appointed ADC after the PD was disqualified. Before entering an appearance, one of defendant's two ADC attorneys told the court he had previously represented (1) the prosecution's investigator in "a civil matter"; (2) the prosecutor himself in "some business transaction"; (3) the prosecutor's ex-wife; and (4) the prosecutor's nephew. The trial court stated its belief that these matters had been completed, and accepted counsel's appearance without any inquiry of defendant regarding these prior representations.

We agree with defendant that these prior representations created several potential conflicts. One attorney's law firm had been repeatedly retained by members of the prosecutor's family. This relationship could have induced defense counsel not to embarrass or attack the prosecution in a highly-publicized murder trial, and could have provided a financial motive not to upset the prosecutor. More important, had the investigator testified at trial (he did not), information defense counsel learned during his prior representation could have limited his ability to cross-examine that witness. Thus, the court should have explained to defendant the nature of the potential conflicts and his right to conflict-free counsel.

 Nevertheless, we conclude that the trial court's failure to make these inquiries and explanations does not require reversal because defendant has not shown the existence of an actual conflict that adversely affected counsel's performance. *See Kelling*, 151 P.3d at 657. The prosecutor involved left the district attorney's office before trial, and the investigator did not testify.

Defendant relies upon *People v. Miera*, 183 P.3d 672, 677–78 (Colo.App.2008), but that case involved an obvious actual conflict of interest. Counsel there represented a defendant accused of sexual assault and was required to cross-examine a witness whom defense counsel had recently represented, and who had been charged with sexually assaulting the same victim. The division there reversed the defendant's conviction because the division found an actual conflict of interest, and because that conflict was shown to have impeded counsel's performance. Defendant has made no showing here that his lawyers' obligations to prior clients somehow impeded their representation of him, and we thus conclude that reversal is not required.

## V. ADC's Motion to Withdraw

Defendant contends that the trial court abused its discretion by denying ADC's motion to withdraw. We reject this argument.

## A. Standard of Review

 We review a trial court's decision regarding whether to allow defense counsel to withdraw for abuse of discretion. *People v. Schultheis*, 638 P.2d 8, 15 (Colo.1981).

## B. Applicable Law

 Rule 1.16 of the Colorado Rules of Professional Conduct lists a variety of reasons for which a lawyer is permitted or required to withdraw as counsel. Counsel must request permission to withdraw from the court. *Schultheis*, 638 P.2d at 13.

 Not all disagreements between attorney and client require a trial court to allow withdrawal. *See People v. Rocha*, 872 P.2d 1285, 1289 (Colo.App.1993). In deciding a motion to withdraw, a trial court must "balance the need for the orderly administration of justice with the fact that an irreconcilable conflict exists between counsel and the accused." *Schultheis*, 638 P.2d at 15. It may also consider, among other things, the possibility that new counsel will be confronted with the same irreconcilable conflict. *Id.*

 In cases where counsel's reason for withdrawal is the defendant's insistence on presenting perjured testimony, counsel is not required to state the specific reasons for requesting withdrawal. *Id.* at 13–14. Counsel need only tell the trial court that an

"irreconcilable conflict" with the client has emerged. *Id.* at 14. If the trial court denies counsel's motion, counsel should make a record of the disagreement outside the presence of the trial court for purposes of appellate review. *Id.* This procedure maintains client confidences and the integrity of the trial, while allowing review of the trial court's decision. *See id.*

## C. Application

Here, ADC moved to withdraw approximately three months before trial and was granted an ex parte hearing in front of an independent judge. Counsel stated at that hearing that their representation of defendant "may be materially limited by [their] responsibility and duties to third persons and [them]selves," and that the conflict was not one that defendant could waive. Despite the judge's inquiries, counsel declined to provide additional information to the judge or to the court reporter alone.

The judge noted the difficulty created by defense counsel's refusal to proffer more information. He then asked defendant if he understood the conflict and still wished to maintain his current counsel. Defendant said that he did. The judge denied the motion to withdraw.

Defense counsel stated that the situation they faced was different from that in *Schultheis*. However, regardless of these factual differences, *Schultheis* requires that counsel provide sufficient information to allow review of the trial court's ruling on counsel's motion to withdraw. *See id.* at 14. We have *no* such information, and therefore no basis for concluding that the trial court abused its discretion.

## VI. Suppression of Evidence

Defendant contends that the trial court erred by denying his motion to suppress evidence seized from the victim's apartment because the affidavit submitted by police in support of the warrant was insufficient to establish probable cause to search the residence. It initially appeared to us that defendant had standing to raise this contention because he resided part-time at the same residence. However, in his petition for re-hearing, defendant asserts the affidavit demonstrates that the victim and another man were the apartment tenants under the lease, and that defendant resided elsewhere. Accordingly, we have significant doubt that defendant has standing to raise the validity of the search warrant and affidavit. *See People v. Curtis,* 959 P.2d 434, 437 (Colo. 1998) (defendant must demonstrate standing to challenge the constitutional validity of a governmental search, and also demonstrate a sufficient connection to the areas searched or the items seized based on the totality of the circumstances). Nevertheless, we will assume, without deciding, that defendant has standing here.

Even assuming that the warrant lacked probable cause, we nevertheless conclude that the evidence was admissible under the good faith exception to the exclusionary rule. Because a conclusion that this exception is operable here requires us to determine whether the police acted in objectively reasonable, good faith reliance on a warrant, we set forth in some detail the factual and legal background necessary to determine that issue.

## A. Relevant Facts

The Jefferson County drug case against defendant was based on drugs, a gun, and money seized from the apartment pursuant to a search warrant. The affidavit supporting the warrant sought authorization to search the victim's apartment, defendant's other apartment, and a business operated by them.

The affidavit contained statements from three different informants stating that defendant was dealing cocaine. One of those informants was the victim in this case. The affidavit stated that the victim and defendant were observed together on multiple occasions, that both defendant and the victim were drug dealers, and that the business to be searched had business cards showing both their names.

The affidavit also stated information showing that the business operated by the victim and defendant was a "front" for drug sales. The information included (1) one informant's

statement to that effect, (2) the business's not maintaining regular hours of operation, (3) the business's reporting greater income than the observed flow of customers could generate, and (4) suspicious behavior by persons coming and going from the business.

The affidavit contained far less information, however, about the apartments to be searched. It stated that on one occasion a surveillance team observed the victim and defendant drive separate vehicles to the victim's apartment. Police verified with the manager of the apartment complex that the victim's name was on the lease. Rather than providing observations of criminal activity at the apartment, however, the affidavit merely stated:

> Based on your affiant's training and past experience investigating drug traffickers, your affiant knows that typical narcotic traffickers maintain in their residence [and] vehicles, books, and records of illegal transactions, address and telephone books showing the identities of customers and suppliers, as well as currency ledgers, and other items providing evidence of illegal trafficking in controlled substances.

Other than this statement, the affidavit contains no link between the victim's apartment and illegal activity.

### B. Standard of Review

■ We review de novo whether an affidavit provided a substantial basis for a judge to conclude that probable cause existed to issue a search warrant. *People v. Bachofer,* 85 P.3d 615, 617 (Colo.App.2003).

### C. General Search and Seizure Concepts

The United States and Colorado Constitutions forbid the issuance of a search warrant except upon a showing of probable cause supported by an oath or affirmation particularly describing the place to be searched and the things to be seized. U.S. Const. amend. IV; Colo. Const. art. II, § 7; *People v. Eirish,* 165 P.3d 848, 852 (Colo.App.2007). The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging, rummaging searches in violation of the Constitution's proscription against unreasonable searches and seizures. *See Andresen v. Maryland,* 427 U.S. 463, 479–80, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

■ Because there is no mechanical formula for determining probable cause, reasonable minds may differ on the question of whether a particular affidavit establishes probable cause. *People v. Altman,* 960 P.2d 1164, 1167 (Colo.1998). A reviewing court should uphold the validity of a warrant if the affidavit accompanying the warrant creates a substantial basis for the conclusion that probable cause existed. *People v. Reed,* 56 P.3d 96, 101 (Colo.2002).

■ The warrant must establish probable cause to believe that contraband or evidence of criminal activity is located in the place to be searched at the time of the warrant application, not merely at some time in the past. *People v. Erthal,* 194 Colo. 147, 148, 570 P.2d 534, 535 (1977). Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched. *Altman,* 960 P.2d at 1167.

To determine whether probable cause exists, courts examine the totality of the circumstances. *Id.* This analysis does not lend itself to mathematical certainties or bright line rules; rather, it involves a practical, common-sense determination whether a fair probability exists that a search of a particular place will reveal contraband or other evidence of criminal activity. *Id.*

■ Probable cause to issue a search warrant must be established within the four corners of the affidavit. *People v. Titus,* 880 P.2d 148, 150 (Colo.1994). Consequently, the affidavit must show a connection between the crime suspected and the area to be searched. *People v. Kazmierski,* 25 P.3d 1207, 1211 (Colo.2001). "An affidavit containing only vague allegations that the defendant engaged in illegal activity without establishing a nexus between the alleged criminal activity and place to be searched cannot establish probable cause." *Id.*

## D. Drug Trade Specific Applications

Most federal circuits have held that observations of drug distribution activity can provide probable cause for the issuance of a search warrant for a suspect's home, even in the absence of an allegation that any illegal activity occurred in the home itself. *See, e.g., United States v. Sparks*, 291 F.3d 683, 689–90 (10th Cir.2002). The rationale underlying this line of cases is as follows:

> [E]vidence associated with drug dealing needs to be stored somewhere, and ... a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

*United States v. Whitner*, 219 F.3d 289, 298 (3d Cir.2000) (citing cases in accord from eight other circuits).

Colorado state courts, however, have not yet expressly adopted this view. Even in drug-related cases, our courts have continued to insist upon a connection "between the crime suspected and the area to be searched." *Bachofer*, 85 P.3d at 617.

In *People v. Hakel*, 870 P.2d 1224, 1227, 1229 (Colo.1994), the court held that an affidavit providing facts showing that the defendant was involved in narcotics trafficking was sufficient to establish probable cause to search the defendant's home. The affidavit also contained a statement from the affiant that, based on his experience, people distributing controlled substances habitually keep records of their transactions. Unlike in the present case, however, the affidavit in *Hakel* stated that the affiant had personal knowledge from prior investigations that the defendant kept records of his transactions. *Id.* at 1229. Additionally, the affidavit indicated that those records were not found in a hotel room being used by the defendant for drug sales immediately prior to the search of the home. *Id.*

The court noted that the affiant's "general opinion about the conduct of most drug traffickers may not in itself have been sufficient to establish probable cause to believe records of the two cocaine transactions were located in [the defendant's] residence." *Id.* However, the court gave weight to the affiant's personal knowledge of the defendant's conduct, including that the defendant had previously kept evidence in a safehouse and that no records were found in the hotel room already searched. *Id.*

A division of this court found insufficient an affidavit supporting a request to search a residence on a rural property where a suspected drug dealer had been seen picking up drugs from a detached garage fifty yards from the home. *Eirish*, 165 P.3d at 851–52, 854. The division reasoned that the affidavit did not allege that the dealer approached the home or that any criminal activity occurred there. *Id.* at 854. Additionally, the affidavit did not link the dealer to the home in any way. *Id.*

The only basis for searching the home in the *Eirish* affidavit was a statement similar to that of the affiant in the present case, that it is common for drug dealers to keep records in "locations used as storage facilities." The division stated: "While an officer's 'training and experience' may be considered in determining probable cause, such training and experience cannot substitute for an evidentiary nexus, prior to the search, between the place to be searched and any criminal activity." *Id.* The division therefore held that the search of the home was invalid.

The supreme court has held invalid a warrant based on a police affidavit alleging that the defendant had been manufacturing methamphetamine at his home approximately one month before the warrant was issued, and was manufacturing methamphetamine at another location immediately preceding the search. *People v. Miller*, 75 P.3d 1108, 1111, 1114–15 (Colo.2003). The court reasoned that, although the affidavit alleged past criminal activity at the home, "it did not tie any current criminal activity or the presence of contraband to [the defendant's] residence." *Id.* at 1114. Thus, the warrant for the

search of the home failed to establish probable cause. *Id.* at 1115.

The supreme court also has held invalid a warrant based on a police affidavit providing information from an anonymous informant that the defendant's residence had an abnormally high number of cars coming and going, and that it had smelled of marijuana in the past. *Titus,* 880 P.2d at 149. Additionally, the affidavit stated that a police informant had been sent to purchase drugs at the home, and was told by the defendant to come back with a known friend of the defendant's because, the defendant said, "I don't need new customers." *Id.* at 149–50. The court reasoned that, although the defendant's remarks created an inference that he was engaged in criminal activity, "absent anything further than reasonable suspicion, the conversation does not—either by itself or when considered with the other evidence—establish probable cause to support the issuance of a search warrant for [the defendant's] residence." *Id.* at 151.

Accordingly, we have significant doubt whether the affidavit here establishes the crucial link between the illegal activity and the victim's home that is required under existing Colorado law. However, we need not reach that issue directly because we conclude that the "good faith" exception to the exclusionary rule is applicable in these circumstances.

### E. Good Faith

■■■■ Typically, when the police conduct a search without a valid warrant, the exclusionary rule operates to suppress the fruits of the search, unless the search falls under an exception to the warrant requirement. *People v. Winpigler,* 8 P.3d 439, 443–44 (Colo.1999). The exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally, rather than a personal constitutional right of the aggrieved person. Whether to invoke the exclusionary rule is an issue separate from the question of whether Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct. *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Applica-

tion of the exclusionary rule is restricted to those areas where its remedial objectives are thought most efficaciously served. *Id.* at 908, 104 S.Ct. 3405.

■■■ The exclusionary rule does not apply to situations where the police act in objectively reasonable, good faith reliance on a warrant, even if a court later finds that the warrant is defective. *People v. Randolph,* 4 P.3d 477, 483 (Colo.2000). In such circumstances, excluding the fruits of the search would not have a deterrent effect on the police. *Leon,* 468 U.S. at 919–20, 104 S.Ct. 3405.

■■■ The General Assembly has codified a version of the *Leon* test that permits admission of otherwise suppressible evidence if it was seized as the result of "a good faith mistake or of a technical violation." § 16–3–308(1), C.R.S.2009. The *Leon* "objectively reasonable" standard and the statutory "good faith" standard are substantially similar. *Randolph,* 4 P.3d at 483; *People v. Leftwich,* 869 P.2d 1260, 1272 (Colo.1994). The statute, however, creates a presumption that an officer was acting in good faith if he or she acted pursuant to a warrant. *See* § 16–3–308(4)(b), C.R.S.2009; *Randolph,* 4 P.3d at 483. This presumption may be rebutted if the officer failed to undertake the search in an objectively good faith belief that it was reasonable. *Id.* If no reasonable officer would have relied upon the warrant, then objective good faith is absent and the good faith exception does not apply. *Id.*

■■■ The fact that a magistrate ultimately approves the warrant is not controlling. *Miller,* 75 P.3d at 1113. The question of reasonableness is to be judged as of the time of warrant application. *Leftwich,* 869 P.2d at 1269 n. 11.

■■■ As relevant here, an officer may not reasonably rely on a warrant where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405; *Randolph,* 4 P.3d at 483–84.

Defendant argues that we should not address the good faith exception because the

prosecution did not raise it in the trial court. However, the court in the Jefferson County drug case admitted the same materials under the good faith exception. Thus, defendant was on notice that the issue would be addressed, and he argued it in his opening appellate brief.

■ We are also unconstrained by a need for factual findings. Whether an officer's actions were objectively reasonable is a question of law that we review de novo. *United States v. Tedford*, 875 F.2d 446, 448 (5th Cir.1989) ("determination that the officers acted in 'good faith' is a conclusion of law subject to de novo review"); *People v. McKinstrey*, 852 P.2d 467, 473 n. 6 (Colo. 1993).

■ Here, we conclude that the officer acted in an objectively reasonable manner in submitting the affidavit, obtaining the search warrant, and executing the search of the victim's apartment. While Colorado law appears to indicate that the information in the affidavit was insufficient to establish the link between clear evidence of drug dealing and presence of books and records in the apartment, in almost every federal circuit it would have been. *See United States v. McCane*, 573 F.3d 1037, 1045 (10th Cir.2009) ("this court declines to apply the exclusionary rule when law enforcement officers act in objectively reasonable reliance upon the settled case law of a United States Court of Appeals"). Thus, the affidavit was not so lacking in indicia of reliability as to render belief that the warrant was legitimate entirely unreasonable. *See People v. Pacheco*, 175 P.3d 91, 96 (Colo.2006).

That some of the information in the affidavit was stale does not dictate a different result. Admittedly, the eight-page single-spaced affidavit begins by reciting information that was almost two years old. But it then details facts and circumstances occurring eleven months before the affidavit, and next describes matters occurring forty-five days before. From there, it sets forth facts arising forty, thirty, twenty, and six days before the affidavit was signed. It thus presents a chronological account that, in sum, provides indicia of current drug dealing by defendant and the victim. While staleness is clearly a factor to consider, the "old" information here sets the stage for the later linking of more recent facts to the indicia of current drug dealing.

The fact that the same officer wrote the affidavit and executed the search may not detract from its reliability, *see Pacheco*, 175 P.3d at 96, but we perceive insufficient evidence here to rebut Colorado's statutory presumption that an officer acting pursuant to a warrant does so in good faith. *See* § 16–3–308(4)(b).

*People v. Gutierrez*, 222 P.3d 925, 941 (Colo.2009) does not dictate a contrary result. There, the supreme court noted that "An affidavit that provides the details of an investigation, yet fails to establish a minimal nexus between the criminal activity described and the place to be searched is nevertheless bare-bones." But shortly after that statement, the court said, "Courts may also consider whether judges reviewing the magistrate's probable cause determination are divided on the question of probable cause or whether they have consistently found probable cause to be lacking."

Here, as previously noted, most federal courts have held that observations of drug distribution activity can provide probable cause for the issuance of a search warrant for a suspect's home, even in the absence of an allegation that any illegal activity occurred in the home itself. *Sparks*, 291 F.3d at 689–90. In our view, the fact that a federal court likely would find probable cause under the circumstances of this case weighs in favor of a good faith determination.

Given this conclusion, we need not address defendant's argument that the trial court erred by admitting the evidence as res gestae.

## VII. Evidence of Motive

Defendant contends that the court committed plain error in allowing testimony and argument that he faced a mandatory minimum prison sentence in the Jefferson County drug case. We disagree.

## A. Standard of Review

Where, as here, no contemporaneous objection is made, appellate review is limited to determining whether there is plain error. Crim. P. 52(b); *People v. Miller*, 113 P.3d 743, 750 (Colo.2005).

Plain error is error that is obvious and substantial. It exists when, after a review of the entire record, a court can conclude with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *See Miller*, 113 P.3d at 750.

## B. Application

■ At trial, the prosecution introduced testimony from the prosecutor in the Jefferson County drug case that defendant faced mandatory minimum prison terms in that case. This testimony was presented to show defendant's motive for killing the victim in 1998. The reasonableness of the Jefferson County prosecutor's position on a mandatory minimum prison term was confirmed in *People v. Shipley*, 22 P.3d 564 (Colo.App.2001) (*Shipley I* ), in which a division of this court concluded that a conviction under the special drug offender statute required a sentence to prison. However, after the trial in this case, the supreme court reversed that decision. *Shipley v. People*, 45 P.3d 1277 (Colo.2002) (*Shipley II* ).

We perceive no plain error. *Shipley II* was not decided until several years after the victim was killed, and that decision could not possibly have influenced defendant's motive in 1998. Moreover, the Jefferson County prosecutor's testimony that imprisonment would be pursued in the drug case by itself would provide defendant with a motive to kill the victim to avoid incarceration. Because no error was plain or obvious at the time of defendant's trial, it follows that there is no plain error here. *See People v. O'Connell*, 134 P.3d 460, 465 (Colo.App.2005) (error not obvious at the time of trial is not plain error).

## VIII. Testimonial Confrontation Clause Issues

Defendant contends the trial court violated his right under the federal and state constitutions to confront witnesses against him by admitting testimonial hearsay from Prim and the victim. We agree that the trial court erroneously admitted Prim's confession to police, but conclude that the error was harmless beyond a reasonable doubt. As to some of the victim's statements, we conclude that a remand is necessary so the trial court can determine whether the statements are testimonial and whether the forfeiture by wrongdoing doctrine applies. However, we conclude that the trial court did not err in admitting the victim's preliminary hearing testimony and the evidence of recorded calls between the victim and defendant because this information was not admitted for the truth of the matter asserted.

## A. Standard of Review

■ We review alleged Confrontation Clause violations de novo. *Bernal v. People*, 44 P.3d 184, 198 (Colo.2002). Where a violation has occurred, reversal is required unless the error was harmless beyond a reasonable doubt. *Raile v. People*, 148 P.3d 126, 133 (Colo.2006).

## B. Applicable Law

■ The federal Confrontation Clause prohibits the admission of testimonial hearsay against a defendant unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Raile*, 148 P.3d at 130.

■ Testimonial statements are those made when the circumstances objectively indicate that there is no ongoing emergency, and "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 821–22, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354.

■ As pertinent here, to determine whether a statement is testimonial in nature, we ask whether a reasonable person in the declarant's position would anticipate the statement's being used in the investigation or prosecution of the crime. *People v. Vigil,* 127 P.3d 916, 925 (Colo.2006).

Even though *Crawford* and *Davis* were announced after defendant's trial was concluded, this case was pending on direct review when *Crawford* was decided. Therefore, those cases apply here. *See Hinojos–Mendoza v. People,* 169 P.3d 662, 667 (Colo. 2007).

■ A criminal defendant can lose the right to confrontation under the doctrine of forfeiture by wrongdoing. *Vasquez v. People,* 173 P.3d 1099, 1103 (Colo.2007); *see Giles v. California,* 554 U.S. 353, ——, 128 S.Ct. 2678, 2684, 171 L.Ed.2d 488 (2008) ("The manner in which the rule was applied [at common law] makes plain that unconfronted testimony would not be admitted without a showing that the defendant intended to prevent a witness from testifying." (emphasis omitted)).

■ Under the doctrine of forfeiture by wrongdoing, the People have the burden of showing, by a preponderance of the evidence, that "(1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to deprive the criminal justice system of evidence." *Vasquez,* 173 P.3d at 1104. The doctrine thus "prevents defendants from profiting by their own misconduct; a defendant who eliminates a witness would otherwise be rewarded with the exclusion of that witness's out-of-court statements." *Id.*

■ Trial courts must hold an evidentiary hearing before making a determination of forfeiture by wrongdoing. *Id.* at 1105.

## C. Application

### 1. Prim's Confession

■ Prim did not testify for the prosecution at defendant's trial because he exercised his Fifth Amendment rights. However, the trial court allowed the police officer who took Prim's confession to summarize what Prim admitted, including the fact that he killed the victim.

The People concede this evidence of Prim's confession was testimonial hearsay because it was made during a police interrogation for the purpose of gathering information for a criminal prosecution. *See Davis,* 547 U.S. at 822, 126 S.Ct. 2266. Thus, the trial court erred by admitting Prim's confession. Nevertheless, the People contend that the error was harmless beyond a reasonable doubt. We agree.

Confrontation Clause violations are in the nature of trial, rather than structural, error. *Arteaga–Lansaw v. People,* 159 P.3d 107, 110 (Colo.2007). If it can be determined that trial error was harmless beyond a reasonable doubt, reversal is never the appropriate remedy. *Id.* In the context of statements admitted in violation of the Confrontation Clause, the supreme court has identified various considerations that may be relevant to a determination of harmlessness. These include (1) the importance of the declarant's statement to the prosecution's case; (2) whether the statement was cumulative; (3) the presence or absence of corroborating or contradictory evidence on the material points of the witness's testimony; (4) the extent of the cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.*

Here, the improperly admitted hearsay testimony of the police officer established that Prim was the person who killed the victim. But the officer's testimony was cumulative because that fact was established through the testimony of two of Prim's fellow gang members (discussed below), to whom Prim also admitted killing the victim. The gang members' testimony was corroborated by the extensive and detailed testimony of So, who had accepted defendant's money and had arranged for Prim to kill the victim, and who drove Prim to and from the scene of the killing. Importantly, Prim did not implicate defendant in his statement to the officer, because Prim had been solicited and paid by So and had no personal contact with defendant. Thus, the other admissible evidence presented by the prosecution established be-

yond a reasonable doubt that Prim had killed the victim.

We thus conclude that the officer's testimony about Prim's confession was harmless beyond a reasonable doubt.

### 2. The Victim's Preliminary Hearing Testimony

The trial court also admitted the victim's preliminary hearing testimony from the Jefferson County drug case. Defendant argues that the admission of this testimony violated the Confrontation Clause. We disagree.

It is undisputed that the preliminary hearing statements were made as part of a criminal prosecution and were testimonial, *see Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, and that the victim was unavailable at trial. *See People v. Fry*, 92 P.3d 970, 979 (Colo.2004) (preliminary hearing testimony is not subjected to "the procedural rigors required by the Confrontation Clause"). However, because the trial court here ruled that the testimony would not be admitted for its truth, the Confrontation Clause was not implicated. *See Crawford*, 541 U.S. at 59, n. 9, 124 S.Ct. 1354 (the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted).

We do not read defendant's opening brief to assert that the admission of the victim's preliminary hearing testimony violated any hearsay rules under the Colorado Rules of Evidence. Accordingly, we do not address the admissibility of the testimony under those rules.

### 3. Victim's Statements After the Bus Stop Shooting

■ The victim made statements to several police officers and a deputy district attorney following the bus stop shooting, and the trial court admitted several of these statements at trial. We conclude these statements were testimonial. Contrary to the People's contention, when the victim made these statements, there was no ongoing emergency, and the statements were made for purposes of later criminal prosecution. Consequently, these statements should have been excluded from evidence under the Confrontation Clause unless the forfeiture by wrongdoing doctrine applies.

Defendant also contends that admission of these statements was improper under the Colorado Rules of Evidence. We disagree.

Even if the statements were admissible under the forfeiture by wrongdoing doctrine, they were not necessarily admissible under the rules of evidence. *See Vasquez*, 173 P.3d at 1106. Accordingly, we must address this contention.

■ The trial court admitted the victim's statements as excited utterances, which is an exception to the hearsay rule. We discern no abuse of discretion in that determination.

■ An excited utterance is an exception to the general rule that hearsay evidence is inadmissible. An excited utterance is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." CRE 803(2). A hearsay statement is admissible as an excited utterance if its proponent shows (1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer; (2) the declarant's statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event. *People v. King*, 121 P.3d 234, 237–38 (Colo.App.2005).

■ The trial court is afforded wide discretion in determining whether a statement is admissible under the excited utterance exception to the hearsay rule. *Id.* at 238.

The evidence showed that the statements to police and to the prosecutor were made in close proximity to the shooting, which occurred late at night; that when the victim made the statements, he was very upset, was short of breath, and was visibly shaking; that the statements were made in response to a very startling event, and were spontaneous; and that the victim without question was in a position to observe the startling event. Accordingly, we conclude that the

victim's statements were admissible under CRE 803(2).

#### 4. Defendant's Threatening Gesture Toward Victim

■ Defendant allegedly made a gun-to-the-head motion toward the victim while the victim was waiting to appear in the Jefferson County drug case. The victim reported the gesture to a police officer and a deputy district attorney, who testified about it at defendant's murder trial.

We conclude the victim's statements were testimonial because they occurred after the gesture was made and when there was no ongoing emergency, and they were made to establish the occurrence of an event that could be relevant in a criminal prosecution. Thus, evidence of the victim's statements about defendant's gesture would violate the Confrontation Clause unless the forfeiture by wrongdoing doctrine applies.

Because defendant's opening brief does not assert that the admission of these statements violated any specific hearsay rules, we need not address the admissibility of the testimony under the Colorado Rules of Evidence.

#### 5. Recorded Calls Between Victim and Defendant

■ The victim recorded several telephone calls between himself and defendant, which were admitted as evidence. Defendant argues that statements within the calls were testimonial, were admitted for their truth, and that their admission also violated the Confrontation Clause. Defendant also contends that transcripts of the recorded calls were inadmissible under the rules of evidence because they were hearsay and were not adoptive admissions. We disagree.

■ Defendant's own statements in the conversations are admissions under CRE 801(d)(2)(A), and the utterances of the victim are not hearsay because they were offered for the limited purpose of putting defendant's responses in context. They were not admitted for the truth of their content. *See People v. Arnold*, 826 P.2d 365, 366 (Colo.App.1991). Therefore, the right of confrontation was not implicated here. *See Crawford*, 541 U.S. at 59, n. 9, 124 S.Ct. 1354.

#### D. Forfeiture by Wrongdoing

■ We first reject defendant's contention that, because the prosecution did not raise this doctrine in the trial court, it cannot now be raised. At the time of defendant's trial, the United States Supreme Court had not decided *Crawford*, on which defendant relies as the basis for his Confrontation Clause arguments. Nor had the United States Supreme Court or Colorado Supreme Court addressed whether the forfeiture by wrongdoing doctrine is available to negate a Confrontation Clause violation.

■ We also disagree with the People's contention that the grand jury's findings in this case establish the elements of the forfeiture by wrongdoing doctrine. A grand jury's finding of probable cause does not require proof by a preponderance of the evidence and is not equivalent to a trial court's ruling on an evidentiary issue. Also, grand juries are accusatory rather than adjudicatory bodies. *People v. Ager*, 928 P.2d 784, 788 (Colo.App.1996).

■ Consequently, we conclude remand is required for an evidentiary hearing to determine whether the doctrine of forfeiture by wrongdoing rendered some of the above-mentioned statements of the victim admissible under the Confrontation Clause. *See Vasquez*, 173 P.3d at 1105; *Pena v. People*, 173 P.3d 1107, 1111 (Colo.2007). On remand, the trial court should not consider the fact of defendant's conviction in this case, but may consider any other evidence, including the evidence proffered at trial. *See* CRE 104; *Vasquez*, 173 P.3d at 1104–05. If the court determines that the forfeiture by wrongdoing doctrine is applicable, defendant's conviction shall stand affirmed, subject to his right of appeal from that determination. If the court determines that the doctrine is inapplicable, the court shall determine whether the admission of the statements was harmless beyond a reasonable doubt. If their admission was not harmless beyond a reasonable doubt, the court shall order a new trial.

## IX. Nontestimonial Confrontation Issues

Defendant contends the trial court violated his confrontation rights under the federal and state constitutions by admitting into evidence statements made by Prim to a fellow gang member. We disagree.

■ When a statement is nontestimonial, and thus does not implicate *Crawford*, we must nevertheless determine whether the statement is constitutionally admissible. *Compan v. People*, 121 P.3d 876, 880–81 (Colo.2005).

■ To do so, we must determine whether the declarant is unavailable and whether the statement bears adequate indicia of reliability. A statement is reliable if it falls within a firmly rooted hearsay exception or if there is a showing of particularized guarantees of trustworthiness. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Vigil*, 127 P.3d at 926.

■ Here, shortly after the victim's murder, Prim told a fellow gang member that he "had killed a guy," had "emptied a whole clip into the car," and had never before "seen such an amount of blood." These statements are not testimonial because Prim made them in the context of conversation with his fellow gang member. A reasonable person in Prim's position would not make such incriminating statements if he believed they would later be used against him in the investigation or prosecution of the crime. *See People v. Villano*, 181 P.3d 1225, 1229 (Colo.App.2008). Accordingly, we conclude that the statements were nontestimonial for *Crawford* purposes.

■ We must next determine whether the statements bear adequate indicia of reliability. *See Compan*, 121 P.3d at 882–85. Under CRE 804(b)(3), statements that subject a declarant to criminal liability are not excluded by the hearsay rule if the declarant is unavailable as a witness. Defendant acknowledges that Prim was unavailable as a witness because he invoked his Fifth Amendment privilege at trial. However, a statement against interest is not a "firmly rooted exception" under the Confrontation Clause. *Lilly v. Virginia*, 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *Stevens v. People*, 29 P.3d 305, 313 (Colo.2001). Therefore, we must examine the evidence of Prim's statements for "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531; *Bernal*, 44 P.3d at 197. This requires a totality of the circumstances review, but the relevant circumstances include only those that surround the making of the statement, and we may not rely on other independent evidence. *People v. Newton*, 966 P.2d 563, 576 (Colo.1998).

We consider a number of factors to determine trustworthiness. They include where and when the statement was made, to whom the statement was made, what prompted the statement, how the statement was made, and what the statement contained. *Id.* at 575–76. Also, we consider the nature and character of the statement, the relationship between the parties to the statement, the declarant's probable motivations for making the statement, the circumstances under which the statement was made, whether the statement is genuinely self-inculpatory or whether it shifts blame to the defendant, whether the statement is made by a codefendant who is attempting to shift blame, and whether the statement is made after arrest. *Bernal*, 44 P.3d at 197–98.

Employing these factors, we conclude that Prim's statements bear particularized guarantees of trustworthiness. First, he made them to a fellow gang member several days following the shooting after the gang member asked Prim, "What happened?" Second, Prim's statements clearly implicate him as the shooter but do not directly implicate defendant because Prim said nothing to his fellow gang member about defendant's involvement. Third, Prim's statements were made to a person whom Prim appeared to have trusted as a fellow gang member, and do not appear to have been made as a boast. Fourth, Prim's statements were made before he was arrested, and there were no later contradictory or inconsistent statements by him.

We thus conclude that Prim's nontestimonial statements to his fellow gang member were admissible at trial.

## X. Cumulative Error

Defendant contends that there were numerous errors that, when viewed cumulatively, deprived him of a fair trial. We disagree.

Numerous formal irregularities, each of which might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event reversal is required. *People v. Roy,* 723 P.2d 1345, 1349 (Colo.1986). However, this is not such a case.

A defendant, although not entitled to a perfect trial, has a constitutional right to receive a fair trial. Under the facts of this case, we conclude that the cumulative effect of the errors we have found did not substantially prejudice defendant's right to a fair trial.

## XI. Restitution

■ Defendant contends the trial court exceeded its authority by ordering the Denver police to pay into the court registry money that was in defendant's possession when he was arrested on another offense. We disagree that the court's action constituted an "improper forfeiture proceeding."

■ Trial courts have broad discretion in determining the appropriate terms of restitution orders. *People v. Harman,* 97 P.3d 290, 294 (Colo.App.2004). We will not disturb a trial court's ruling on restitution absent an abuse of that discretion. *Id.*

■ Section 18–1.3–603(1), C.R.S. 2009, provides that every order of conviction for a felony offense shall include consideration of restitution. "At the time of sentencing, the sentencing court must determine the proper amount of restitution and costs and must 'impose' an order of restitution and enter a 'judgment' for costs." *People v. Tipton,* 973 P.2d 713, 715 (Colo.App.1998). Trial courts can order that money seized from a defendant at the time of his or her arrest be applied toward restitution. *See id.* at 714–15.

When defendant was arrested, he possessed approximately $2,700 in cash, and at sentencing, the trial court ordered that

$2,223.05 of it be paid to the Victim Compensation Board. We conclude this was authorized by the statute.

*People v. Rautenkranz,* 641 P.2d 317 (Colo. App.1982), does not require a different result. There, the division merely held that a defendant could file, in a criminal proceeding, a motion for return of property seized from him. However, the division did not prohibit the application of funds seized to satisfy a restitution obligation. Accordingly, the case is inapposite. We therefore perceive no error or abuse of discretion by the court.

## XII. Conclusion

The case is remanded to the trial court with directions to determine whether the victim's statements after the bus stop shooting and his statements concerning defendant's threatening gesture, which we determined are testimonial, were nevertheless admissible under the forfeiture by wrongdoing doctrine and, if not, whether their admission was harmless beyond a reasonable doubt.

MILLER and ROTHENBERG *, JJ., concur.